**FOURTH DIVISION
DILLARD, P. J.,
MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 2, 2021**

# In the Court of Appeals of Georgia

A21A0731, A21A0740, A21A0741, A21A0779. BLONDELL et al. v. COURTNEY STATION 300 LLC et al.; and vice versa (four cases).

PINSON, Judge.

Teressa and Alvin Blondell were injured when a pergola swing at a Chatham County apartment complex collapsed while they were sitting on it. Three-and-a-half years later, Teressa also suffered burn injuries when she tried to light a charcoal grill. The Blondells sued the swing manufacturer, the current property owner, and two sets of property managers. The trial court denied summary judgment except as to damages for the burn injuries, which the trial court determined were too remote, and as to a single public nuisance claim against one defendant. The Blondells appealed the grant of summary judgment on their damages claims, and the four defendants cross-appealed to challenge the denial of summary judgment on the other claims.

We ultimately affirm all but one of the trial court's summary judgment orders. First, although proximate cause is typically a jury question, we agree that the absence of proximate cause between the defendants' alleged swing-related negligence and Teressa's burn injuries is sufficiently "plain and undisputed" to support summary judgment for defendants as to those damages. Second, the same cannot be said about the swing manufacturer's failure to provide instructions for hanging the swing: the record contains evidence potentially connecting that failure to the Blondells' injuries, and that potential cause is not so remote that we can take the rare step of taking that question from the jury. Third, we agree that the acceptance doctrine does not let the property manager that installed the swing off the hook, although for different reasons than the trial court gave. And fourth, we agree that a genuine dispute of fact remains as to whether the current property owner and manager conducted reasonable inspections or were chargeable with constructive knowledge of the hazard posed by the swing, which collapsed soon after they bought and began managing the property. Our only point of disagreement with the trial court has to do with the private nuisance claim: the trial court erred in allowing that claim to go forward because the Blondells failed to make the case that the defendants' conduct related to the swing caused any continuous invasion of their interest in the land. So, all told, we affirm the judgment

of the trial court in each of these appeals except for Case No. A21A0741, which we affirm in part and reverse in part.

## Background

In June 2013, Teressa and Alvin Blondell were sitting on a two-seat pergola swing next to the pool at the Courtney Station Apartments, where they were leasing an apartment.[1] The swing partially dislodged from the overhead beam from which it was suspended, and both Blondells fell to the concrete below and suffered injuries. Teressa was knocked unconscious and was later diagnosed with a concussion, which has caused lasting cognitive impairment and some associated physical and psychological conditions.

The swing's collapse was caused by the failure of one of the eyebolts from which the swing was suspended. A "fatigue fracture" developed in the shank of the eyebolt, which ultimately caused the bolt to snap. Evidence showed that similar eyebolts had a weight-bearing capacity of only 160 pounds and were accompanied

---

[1] In reviewing summary judgment orders, we view the evidence in the record in the light most favorable to the parties opposing summary judgment. *Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991) (emphasis omitted). The plaintiffs here, Teressa and Alvin Blondell, opposed summary judgment, so we recount the relevant evidence here in the light most favorable to them.

3

by warnings that they were not to be used for overhead lifting or supporting human weight. One of the Blondells' expert witnesses testified that the eyebolts here were "totally inappropriate" for suspending the swing. Another expert opined that, to comply with applicable industry standards, a "commercial hinge" should have been used.

The swing had been installed by an employee of defendant ContraVest Management Company shortly after the 2008 completion of the apartment complex. The employee, James McNabb, followed the assembly instructions included with the swing, which did not include any instructions or warnings as to hanging it. To hang the swing, McNabb used carbon steel eyebolts to suspend the swing's chains from the overhead beam of the trellis from which it hung. Each eyebolt was affixed so that its "eye" was situated approximately three inches from the beam, leaving three inches of the eyebolt's shank exposed. Though McNabb could not recall whether the eyebolts were included in the assembly kit or purchased by him at a hardware store, record evidence reflects that the assembly kit sold with the swings did not include any parts for attaching the swing's chain to any overhead support. McNabb testified that, if the hardware had not been included in the assembly kit, he would have simply "guess[ed]" as to the proper type and size hardware to use based on the swing's size

4

and weight, and that he was not aware of any consultations by ContraVest with an engineer or architect regarding the swing's installation. McNabb testified that he would have followed any instructions he was given on assembling and installing the swing.

In April 2013, a few weeks prior to the swing collapse, Courtney Station 300, LLC acquired the apartment complex from its original owner, Courtney Station, LLC. Courtney Station 300 retained RAM Partners, LLC to manage the complex, replacing ContraVest, which had managed the property since its construction. A RAM Partners employee who inspected the property prior to its purchase testified that he was "not familiar" with the safety standards for hanging swings and that his inspection was limited to "pull[ing] on" and "sit[ting] on" them "to make sure everything [was] intact and not throwing [him] onto the ground[.]" There was evidence that by 2013, the swing hardware was rusted to a degree that it should have been replaced.

Since the swing collapse, Teressa had experienced symptoms of cognitive impairment, including poor judgment and erratic behavior. Nearly three-and-a-half years after the collapse, she tried to light a charcoal grill—she had never done that before—and became engulfed in flames. Teressa was transported to an Augusta burn center, where she remained in an induced coma for months.

The Blondells sued Richey Industries, ContraVest, Courtney Station 300, and RAM Partners, asserting claims for products liability, premises liability, negligent construction, and nuisance. They sought damages for both their immediate injuries suffered as a result of the swing collapse and Teressa's burn injuries from the grill incident.

Following extensive discovery, all four defendants moved for summary judgment. The trial court granted the defendants' motions concerning Teressa's burn injuries on the ground that those injuries were not a foreseeable consequence of any defendant's negligent act or omission. The court denied the defendants' motions for summary judgment as to their liability for the Blondells' initial injuries, except with regard to ContraVest's liability based on the theory of public nuisance, as to which the court granted summary judgment. The trial court also declined to rule on the defendants' motions for summary judgment as to the Blondells' claims for punitive damages and litigation expenses, opting to hold those issues in abeyance until closer to trial. These appeals followed.

## Discussion

The principal appeal and each of the three cross-appeals seek review of the trial court's summary judgment orders, so our review of the issues on appeal is de novo. See *Johnson v. Omondi*, 294 Ga. 74, 76 (751 SE2d 288) (2013). For each issue, the ultimate question is whether, viewing the evidence in the light most favorable to the party opposing summary judgment (here, the Blondells), a genuine issue of material fact remains and thus precludes judgment as a matter of law. OCGA § 9-11-56 (c); see, e.g., *Smith v. Tibbits*, 359 Ga. App. 362, 365 (857 SE2d 820) (2021).

### Case No. A21A0731

1. In the principal appeal, the Blondells argue that the trial court erred when it granted summary judgment to defendants as to Teressa's burn injuries on the ground that those injuries were not a foreseeable consequence of their negligence (if any). We disagree.

To recover for injuries caused by the negligence of another, a plaintiff must establish four elements: a duty owed to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff, and causation, i.e., a connection between the breach and the injury. *City of Richmond Hill v. Maia*, 301 Ga. 257, 258–259 (1) (800 SE2d 573) (2017).

7

To establish causation, the plaintiff must prove that the defendant's negligence was both the "cause-in-fact" and the "proximate cause" of the injury. See *Maia*, 301 Ga. at 258–259 (1). Cause-in-fact requires a determination that, but for the defendant's act, the injury to the plaintiff would not have occurred. See *Strength v. Lovett*, 311 Ga. App. 35, 43-44 (2) (b) (714 SE2d 723) (2011) ("To show that the wrongful conduct of the defendant is a cause in fact of his injuries, a plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury[.]"). The plaintiff must offer evidence that affords a reasonable basis for the conclusion that it is more likely than not that the defendant's conduct did in fact cause the injury. See *Grinold v. Farist*, 284 Ga. App. 120, 121 (1) (643 SE2d 253) (2007).

Proximate cause, on the other hand, is a separate "limit on legal liability." *Johnson v. Avis Rent A Car Sys., LLC*, 311 Ga. 588, 593 (858 SE2d 23) (2021) (punctuation omitted). A determination that a defendant's conduct was not the proximate cause of the injury is not a determination that no causal connection existed but that, as a matter of "policy," "the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." Id.; see also DAN B. DOBBS, PAUL T. HAYDEN AND ELLEN M. BUBLICK, THE LAW OF TORTS § 198 (2d ed.) ("The so-called proximate cause issue is not about causation at all but about the appropriate

8

scope of legal responsibility."). This policy decision is largely grounded in the concept of foreseeability: a wrongdoer should be responsible only for consequences which, based on our common sense and understanding, would probably or naturally flow from his conduct. See *Tyner v. Matta-Troncoso*, 305 Ga. 480, 485 (3) (826 SE2d 100) (2019). Given the "amorphous nature" of this proximate cause standard, CHARLES R. ADAMS III, GA. LAW OF TORTS § 2:18, "it is axiomatic that questions regarding proximate cause are 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed cases.'" *Ontario Sewing Mach. Co. v. Smith*, 275 Ga. 683, 687 (572 SE2d 533) (2002). See, e.g., *Johnson*, 311 Ga. at 593–95 (holding that, as a matter of law, the defendants' failure to secure their rental car lot was not a proximate cause of the plaintiffs' injuries, which occurred when the defendants' employee stole a vehicle from the lot and later crashed into the plaintiffs' car during a high-speed police chase).

Here, the absence of proximate cause between the defendants' swing-related negligence and Teressa's burn injuries is sufficiently "plain and undisputed" to support the trial court's grant of summary judgment. Nearly three-and-a-half years passed between the 2013 swing accident and Teressa's 2016 grill incident, and Teressa's 2016 injuries resulted directly from her own volitional conduct in pulling

9

out, setting up, and lighting the grill with no previous experience in doing so. Even if either the passage of time or her own conduct were not enough on their own to eliminate the defendants' negligence as a proximate cause of her burn injuries, together they break the chain of legal causation between the defendants' conduct and her burn injuries. Under these circumstances, Teressa's burn injuries plainly were not, "according to ordinary and usual experience," a "probable" consequence of defendants' alleged negligence with regard to the manufacture, installation, or maintenance of the swing. *Johnson*, 311 Ga. at 292 (punctuation omitted). See, e.g., *Tyner*, 305 Ga. at 488 (2) (holding that, as a matter of law, the defendant landlord's failure to repair a gate latch was not a proximate cause of the plaintiff's injuries from an attack by his tenants' pit bulls after their escape from the fenced yard, where the landlord had no knowledge that the tenants owned aggressive dogs); *Goldstein, Garber & Salama*, 300 Ga. at 842–43 (1) (holding that, as a matter of law, dental practice's allegedly insufficient policies on patient sedation and staff supervision were not a proximate cause of the sexual assault of a sedated patient by nurse anesthetist during a dental procedure); *McAuley*, 251 Ga. at 6 (5) (holding that, as a matter of law, a defendant's negligent driving, which caused an accident that led to the plaintiff's paraplegia, was not a proximate cause of the later death of the

10

plaintiff's infant child conceived after the accident, despite evidence that the death was a result of birth complications caused by the paraplegia); *Arnold v. Turbow*, 357 Ga. App. 533, 538 (1) (848 SE2d 698) (2020) (holding that, as a matter of law, the defendants' allegedly negligent decision to discharge an autistic patient to a personal care home was not a proximate cause of the patient's choking death at the personal care home eight months later because it was "too causally remote"). The trial court therefore properly granted summary judgment to the defendants on this issue.

*Case No. A21A0740*

2. In the first cross-appeal, manufacturer Richey Industries contends that the trial court erred in finding a genuine factual dispute about whether Richey's failure to provide installation instructions or warnings was a proximate cause of the Blondells' injuries. There was no error.

Georgia law imposes a common-law duty on suppliers of chattels "to warn of foreseeable dangers arising from the reasonable use for which the product is intended and requires the exercise of reasonable care to inform [the product's users] of the dangerous condition or of the facts which make the product likely to become dangerous." *R & R Insulation Servs. v. Royal Indem. Co.*, 307 Ga. App. 419, 427 (3) (705 SE2d 223) (2010) (punctuation omitted). See also *Dozier Crane & Machinery,*

11

*Inc. v. Gibson*, 284 Ga. App. 496, 499 (2) (644 SE2d 333) (2007) (holding that seller of crane had duty to warn those operating the crane of the foreseeable risks of electrocution). This duty to warn extends to a manufacturer's instructions regarding the installation of its product. See *R & R Insulation Servs.*, 307 Ga. App. at 427–28 (3) (a) (i) (holding that manufacturer could be held liable where instructions failed to include warnings about the use of certain materials in the installation of its product). As with other negligence claims, plaintiffs asserting a failure-to-warn claim must establish both causation-in-fact and proximate cause, and as noted above, these questions are ordinarily left to the jury.

To begin with, there is evidence from which a jury could conclude that Richey's failure to provide instructions was a cause-in-fact of the swing's collapse. A plaintiff claiming that a manufacturer's deficient installation instructions resulted in injury must present evidence to support a reasonable inference that the omitted warning more likely than not would have prevented the injury the plaintiff suffered. *R & R Insulation Servs.*, 307 Ga. App. 427 (3). "A mere possibility of such causation is not enough." Id. Here, the swing could not operate as intended without being hung from a structure. The two pages of assembly instructions, however, specified neither the swing's weight nor its weight capacity when in use, offered no instructions or

12

warnings about hanging the swing with adequate support, and gave no guidance on the hardware needed to safely bear the weight of the swing and anyone sitting on it. Other evidence showed that the swing required much more robust attachment hardware than the eyebolts on which it was hung and that the failure of one inadequate eyebolt caused it to collapse. And McNabb, who installed the swing, testified that he followed the instructions provided with the swing and would have heeded any warnings and additional installation instructions had they been provided. This evidence, viewed in the light most favorable to the Blondells, would permit a jury to determine that, more likely than not, the absence of installation instructions caused their injuries. See *Wilson v. Allen*, 272 Ga. App. 172, 174 (2) (612 SE2d 39) (2005) (affirming denial of summary judgment for defendant where evidence viewed most favorably to the plaintiff provided reasonable basis to conclude that the plaintiff's injuries were more than likely the result of the defendant's negligent driving).

The question of proximate cause, too, is not so "plain or undisputed" that it should be taken from the jury. As explained above, the touchstone for proximate cause is foreseeability. And nothing in the chain of causation here (from lack of instructions to swing collapse) that the evidence would permit a jury to accept is so

13

plainly unforeseeable that liability should be cut off as a matter of law. See *R & R Insulation*, 307 Ga. App. at 429–30 (3) (a) (iv) (holding that the evidence authorized a jury to decide whether a manufacturer's failure to warn of the dangers of installing fiberglass plastic panels with nylon rivets in the oven room at a chicken processing plant was the proximate cause of the fire that badly damaged the plant); *Dozier Crane*, 284 Ga. App. at 499–500 (2) (holding that the evidence authorized a jury to decide whether crane supplier's failure to apply decal warning of electrocution risks was the proximate cause of the plaintiffs' injuries); see also *Key Safety Sys*., 334 Ga. App. at 720–21 (1) (plaintiff's testimony that he would have purchased a different vehicle had he been warned of the risk of seatbelt failure was sufficient to create a jury question on whether the manufacturer's failure to warn was the proximate cause of the plaintiffs' injuries).

This conclusion holds despite the lapse of time between the swing's installation and its collapse. The mere fact that the swing remained intact for more than five years before the accident does not eliminate the absence of instructions as a proximate cause as a matter of law. Sometimes wrongful conduct leads to immediate injury, but other times the injury happens at a much later date, and our cases have not generally authorized judges to cut off liability *solely* on the basis that too much time passed.

14

See *Dozier Crane*, 284 Ga. App. at 498–500 (2) (holding that a jury question remained as to whether failing to apply warning decals to the operator's cab of a crane was the proximate cause of the electrocution accident that injured plaintiffs, even where the crane had operated "for over 4,500 hours without incident"). This is not to say that the five-year gap is "irrelevant" to the question of proximate cause, see Dissent at 5, but only that it is for the jury to make the "policy decision" whether to cut off liability on that basis. See *McAuley*, 251 Ga. at 6 (5).

In addition, none of the alleged negligence of Richey's co-defendants is the kind of intervening act that would break the causal chain as a matter of law. For an independent act or event to eliminate other conduct as a proximate cause, it must be neither foreseeable by the defendant nor triggered by the defendant's act, and it must have been "sufficient of itself to cause the injury." *Maia*, 301 Ga. at 259 (1) (punctuation omitted). See also *Goldstein, Garber & Salama*, 300 Ga. at 842 (1); *Southern Railway Co. v. Webb*, 116 Ga. 152, 152 (1) (42 SE2d 395) (1902); *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335, 341 (1) (c) (671 SE2d 844) (2008). If an intervening act "might reasonably have been anticipated by the defendant," the intervening act will not break the chain of causation. *Southern Railway*, 116 Ga. at 152 (1). And that goes for even wrongful or negligent acts of third parties. See, e.g.,

15

*Walker v. Giles*, 276 Ga. App. 632, 643–47 (2) (624 SE2d 191) (2005) (holding that negligence of physicians who treated patient upon second hospital admission did not, as a matter of law, break causal chain between plaintiff's injury and the negligence of initial treating physicians); *Harrison v. Jenkins*, 235 Ga. App. 665, 668–69 (1) (510 SE2d 345) (1998) (holding that negligence of third-party motorist did not, as a matter of law, break causal chain between plaintiff's injury and the defendant's negligence); *Wade v. Polytech Indus., Inc.*, 202 Ga. App. 18, 23 (3) (413 SE2d 468) (1991) (noting that "the risk created by the defendant may include the intervention of the foreseeable negligence of others").

On this record, a jury could conclude that the alleged acts of negligence on the part of Richey's co-defendants were reasonably foreseeable. Any negligence in the installation of the swing could be deemed by a jury to be a reasonably foreseeable result of failing to include any installation instructions or warnings—indeed, such a failure could well perpetuate rather than sever the chain of causation. See, e.g., *Atlanta Obstetrics & Gynecology Group, P.A. v. Coleman*, 260 Ga. 569, 576–71 (398 SE2d 16) (1990) (holding that the defendant physician was not entitled to judgment as a matter of law where his negligence necessitated later treatment by a second physician, after which the patient suffered a stroke). And the allegedly inadequate

16

inspections, although not a result of the absence of instructions, were not so unforeseeable as to break the causal chain as a matter of law. See *Williams v. Grier*, 196 Ga. 327, 337 (2) (26 SE2d 698) (1943) (holding that, even where an intervening cause was not set in motion by the original negligent act, "the original wrongdoer may still be held liable, if the intervening [act] could reasonably have been anticipated or foreseen by him"); *Pruette*, 295 Ga. App. at 341–42 (1) (c) (declining to hold that the patient's "do not resuscitate" order was an intervening cause that, as a matter of law, sufficiently broke the causal chain between the defendant physician's alleged negligence and the patient's death).

The dissent suggests that inadequate maintenance by a property owner should never be reasonably foreseeable, but there is not a meaningful difference between this and the foreseeability of other kinds of third-party negligence, like the negligent driving of a third-party motorist, see *Harrison*, 235 Ga. App. at 668–69 (1), or the malpractice of a third-party physician, see *Walker*, 276 Ga. App. at 643–47 (2). Just as the juries in those cases could decide that such follow-on negligence was foreseeable, a jury could conclude that it would be reasonably foreseeable for a property owner to not closely inspect outdoor furniture after its initial assembly.

17

The dissent also cites testimony that "highlights what we all know to be true: Outdoor furniture needs regular maintenance to ensure its safety." But the question here is not whether the property manager (or anyone) should have inspected the swings, only whether it was foreseeable that they would neglect to do so. Maybe we all "know," as the dissent says, that we should regularly maintain outdoor furniture. But if we all know that, then we also all know that plenty of people are likely to neglect that maintenance. In other words, a jury could conclude based on common experience that failing to closely inspect outdoor-swing attachments, even over a long period of time, is the kind of "wrongful act" that "could reasonably have been anticipated" by Richey. See, e.g., *Harrison*, 235 Ga. App. at 669–70 (1) (in multi-car accident case, noting that "[i]t is foreseeable that following drivers could become involved in an accident because of the unexpected need to stop *and because the following drivers may be driving negligently*" (emphasis supplied)).

And just to be clear, that limited proposition—that a jury *could* make such a foreseeability determination, and so the judge should not—is the extent of the conclusion here. This limited conclusion works no change in our foreseeability jurisprudence but just sticks to the settled principle that juries must decide whether an intervening act breaks the chain of causation outside of "plain and undisputed

18

cases," *Johnson*, 311 Ga. at 593 (citation and punctuation omitted). See *Walker*, 276 Ga. App. at 646 (2) ("The ultimate resolution of whether a subsequent act was foreseeable for proximate cause purposes involves a public policy determination that is best left to a jury except in rare cases."). See also *Hayes v. Crawford*, 317 Ga. App. 75, 79 (730 SE2d 26) (2012) (where "reasonable minds could differ" as to whether an intervening act was the sole proximate cause of a plaintiff's injuries, summary judgment in favor of the defendant is not proper); *Martin v. So. Bell Tel. & Tel. Co.*, 126 Ga. App. 809, 813 (192 SE2d 176) (1972) (holding that whether a third party's negligence was an intervening cause so as to relieve the defendant from liability "should not be determined as a matter of law but [was] properly the jury's prerogative"), rev'd on other grounds, 229 Ga. 881 (194 SE2d 910) (1972).[2]

In short, whether Richey's alleged negligence was the proximate cause of the Blondells' injuries is a question for the jury. See *Key Safety Sys., Inc. v. Bruner*, 334

---

[2] Because the conclusion here is only that this question of proximate cause, on these particular facts, is for the jury, this decision also does not threaten any class of defendants, or even Richey, with liability "in perpetuity." And in a similar vein, it should be noted that this decision does not address the scope of Richey's duty to provide instructions or whether that duty was breached here. Richey's cross-appeal enumerates as error only the trial court's proximate-cause ruling, and so that is the only issue that is addressed here. Whatever the merit of the dissent's positions on the duty to warn under these circumstances or the scope of duty owed for products sold to commercial vendors, those issues are not properly before this Court on appeal.

19

Ga. App. at 720 (1); *Walker*, 276 Ga. App. at 646 (2). The trial court thus properly denied summary judgment on this issue.

3. In the second cross-appeal, former property manager ContraVest contends that the trial court erred in denying summary judgment on the Blondells' claims against it based on its installation and maintenance of the swing. ContraVest argues that the acceptance doctrine barred plaintiffs' negligence claims and that their claims for nuisance and for punitive damages and attorney fees fail as a matter of law. We conclude that the acceptance doctrine does not apply, at least not as a matter of law, so the negligence claim should proceed to trial. But the nuisance claim fails as a matter of law.

(a) The acceptance doctrine shields independent contractors from liability for injuries to third parties caused by defective work after the work has been completed, turned over, and "accepted" by the property owner who contracted for the work. See *Thomaston Acquisition, LLC v. Piedmont Const. Group, Inc.*, 306 Ga. 102, 104 (2) (a) (829 SE2d 68) (2019). The idea is that "[b]y accepting the completed work, presumably after a reasonably careful inspection to identify any defects, the owner adopts the work as his own, deprives the contractor of all opportunity to rectify his

20

wrong, bears the immediate duty to make the premises safe, and is therefore accountable for future injuries." Id. (punctuation omitted). Accord CHARLES R. ADAMS III, GA. LAW OF TORTS § 5:5 (updated Dec. 2020) ("following acceptance of the work by the owner of the premises, the owner, not the independent contractor, becomes liable for [the] defective condition of the work").

Under the acceptance doctrine, liability shifts from the contractor to the property owner "at the moment the work is turned over to and accepted by the owner." Id. This means that responsibility does not shift unless the contractor can show that the work was "fully completed by the contractor [and] fully accepted by the owner or proprietor, and the contractor fully discharged of the contract." *Johnson v. E.A. Mann & Co.*, 273 Ga. App. 716, 719 (2) (616 SE2d 98) (2005) (punctuation omitted).

In practical terms, a critical fact for establishing acceptance is the "transfer of control over the site to the owner." 4A PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR. CONSTRUCTION LAW § 13:56 (updated Aug. 2021); see, e.g., *Stopanio v. Leon's Fence and Guardrail, LLC*, 346 Ga. App. 18, 23–24 (2) (a) (815 SE2d 232) (2018) (explaining that "acceptance" of a road contractor's work occurred on the date the Georgia Department of Transportation issued a preliminary acceptance under which

21

it reassumed control over the affected portion of the roadway, even though the Department did not issue a final acceptance letter to a road contractor until later), overruled on other grounds by *Dep't of Pub. Safety v. Ragsdale*, 308 Ga. 210 (839 SE2d 541) (2020); *Smith v. Dabbs-Williams General Contractors, LLC*, 287 Ga. App. 646, 648 (1) (653 SE2d 87) (2007) (holding that the acceptance doctrine barred a claim against a contractor for a defective stairway when the property owner had accepted the construction work and the contractor "no longer exercised any control over" the facility it had built). Focusing on control aligns with part of the rationale for the doctrine: "[a]fter the work has been accepted, a contractor generally has no authority to inspect or make changes to the property, and it may not be authorized even to enter the premises" to mitigate liability risks. *Thomaston Acquisition*, 306 Ga. at 107; see *Ogles v. E.A. Mann & Co.*, 277 Ga. App. 22, 24 (1) (625 SE2d 425) (2005) ("a road contractor cannot be held responsible for completed work over which it no longer exercises any control") (punctuation omitted). By contrast, a contractor who retains control over the project or property does not have the same need for the acceptance doctrine's protection.

On this record, ContraVest has not established "acceptance" sufficient to insulate it from liability. It is undisputed that the swing was installed, and the work

was "completed," in 2008. But ContraVest has not specified when or in what manner its work was "accepted" by Courtney Station, LLC. In its opening brief, ContraVest states only that "acceptance occurred at the time the swing was completed, when ContraVest turned over its work to the then premises owner and occupier, Courtney Station, LLC." This assertion is not accompanied by any record support showing that ContraVest did anything to "turn over" its work to Courtney Station, LLC, or that Courtney Station, LLC ever acknowledged, much less inspected and accepted, the work. That kind of evidence is needed under the circumstances of this case—where the contractor retained day-to-day control over and responsibility for maintaining the property, and the property owner maintained no regular presence there —because the transfer of control that signifies acceptance at the end of a one-off project is not readily apparent in this kind of continuing contractual relationship. Cf. *Stopanio*, 346 Ga. App. at 23–24 (2) (a) (acceptance occurred when work had been inspected and approved and contractor no longer had "actual physical control over" the work site); *Smith*, 287 Ga. App. at 648 (1) (acceptance occurred when work was paid for and contractor had been instructed to leave the premises). Without any such evidence showing that, despite its role as day-to-day property manager, ContraVest turned over

23

its work to Courtney Station, LLC, and that the owner "accepted" the work in some way, there is no basis for us to conclude that the acceptance doctrine was triggered.[3]

ContraVest also offers an alternative theory of acceptance. It contends that, at the least, the *new* owner, Courtney Station 300, accepted its work on the swing when Courtney Station 300 bought the property from Courtney Station, LLC in 2013 "as is," five years after ContraVest installed the swing. But ContraVest offers little argument and cites no authority for expanding the acceptance doctrine's reach in this way. To the contrary, the cases consistently describe and contemplate acceptance as a process in which a contractor "turns over" discrete work to the owner with which it has contracted, who has an opportunity to inspect and accept the work on completion and thereby "adopt[] the work as his own." *Thomaston Acquisition*, 306 Ga. at 104; see *Johnson*, 273 Ga. App. at 719 (2) (acceptance did not occur until work

---

[3] This Court has suggested that the acceptance doctrine might not apply at all when the contractor retains a "continuous duty of inspection . . . after turning work over" to the owner. *Sims v. Amer. Cas. Co.*, 131 Ga. App. 461, 469 (4) (206 SE2d 121) (1974). But that was dicta, and the case we cited for that purported exception, *Higgins v. Otis Elevator Co.*, 69 Ga. App. 584 (1) (26 SE2d 380) (1943), just suggested that *other* acceptance-doctrine exceptions (for "imminently dangerous" or "intrinsically dangerous" work) would apply with greater force when the contractor had a continuous duty of inspection. In any event, in this case, given the absence of any affirmative evidence of turning over and acceptance of the work, we need not decide whether this categorical "continuous inspection" exception exists.

was completed, inspected, and approved). We are not aware of any binding authority supporting ContraVest's much broader incorporation-by-reference theory of "acceptance"—i.e., that the purchase of a property relieves any past contractors who did work on that property from any future liability as a matter of law, based merely on the fact of the purchase. Particularly given the throwaway nature of this argument in the briefing before us, we decline to go out on that unsupported limb here.

In sum, to be entitled to summary judgment based on the acceptance doctrine, ContraVest bears the burden of showing undisputed facts that establish this affirmative defense. See *Lau's Corp. v. Haskins*, 261 Ga. at 491. Under the circumstances here, an unsupported assertion that acceptance of its work occurred at some point prior to the swing collapse, under one property owner or the other, is not enough, so summary judgment on this basis was properly denied.[4]

---

[4] The trial court denied summary judgment based on the acceptance doctrine, but for different reasons: it found that questions of fact remained about whether one of the exceptions to the doctrine applied here. See *Thomaston Acquisition*, 306 Ga. at 108 (3) (hidden defect exception); *Ogles*, 277 Ga. App. at 25 (1) ("imminently dangerous" exception). But because we affirm the court's order on the threshold basis that the doctrine was not triggered in the first place—at least not as a matter of law—we need not reach those alternative bases for denying summary judgment. See *I.A. Group, Ltd. Co. v. RMNANDCO, Inc.*, 346 Ga. App. 396, 402 (1) (816 SE2d 359) (2018) (denial of summary judgment will be affirmed if it is right for any reason).

(b) As for Blondells' nuisance claims, ContraVest contends that the trial court erred in finding that there were genuine issues of material fact as to whether the assembly and installation of the swing created a private nuisance. Because the Blondells have failed to present any evidence that ContraVest's conduct invaded their property interests, we conclude that ContraVest is entitled to summary judgment on the private nuisance claim.

Nuisance defies "any exact or comprehensive definition," *Landings Ass'n, Inc. v. Williams*, 309 Ga. App. 321, 329 (3) (711 SE2d 294) (2011) (punctuation omitted), reversed on other grounds, 291 Ga. 397 (728 SE2d 577) (2012), but it does have some core requirements. Most relevant here, the hallmark of a nuisance claim is some invasion of the plaintiff's interest in land. See *Landings Ass'n*, 309 Ga. App. at 329–30 (3) ("[N]uisance law is grounded in the fundamental premise that everyone has the right to use his or her property as he or she sees fit, provided that in so doing the owner or occupier does not unreasonably invade the corresponding right of others to use their own property as they see fit."); *City of Albany v. Stanford*, 347 Ga. App. 95, 101 (815 SE2d 322) (2018) (Gobeil, concurring specially) ("Although sounding in tort, a private nuisance claim is generally viewed as a remedy for the interference with an owner's or occupier's interest in real property."). Although nuisance is

26

defined broadly in our Code as "anything that causes hurt, inconvenience, or damage to another," OCGA § 41-1-1, that "hurt" or damage" must "arise[] from acts which affect the land itself." *Fielder v. Rice Const. Co.*, 239 Ga. App. 362, 365 (522 SE2d 13) (1999) (quoting *Cox v. De Jarnette*, 104 Ga. App. 664, 675 (2) (A) (123 SE2d 16) (1961)); RESTATEMENT (SECOND) OF TORTS § 821D (1979) ("A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land."). A plaintiff in a nuisance action may recover for property damage or personal injuries, see OCGA § 41-1-4, but not without first establishing "a real and appreciable interference with the plaintiff's use and enjoyment of his land." RESTATEMENT (SECOND) OF TORTS § 821F, comment c (1979). Accord *Landings Ass'n*, 309 Ga. App. at 329–30 (3); *Cox*, 104 Ga. App. at 675 (2) (A) ("The common law and the Restatement of Torts restrict the action for private nuisance to invasions of interest in the use and enjoyment of land."); Charles R. Adams III, GA. LAW OF TORTS 14:3 (updated Dec. 2020) ("an actionable private nuisance must involve an invasion of an interest in the use and enjoyment of the plaintiff's land").[5]

---

[5] This required element—the invasion of the use and enjoyment of land—distinguishes a nuisance claim from a negligence claim. See RESTATEMENT (SECOND) OF TORTS § 822, comment b (1979) (distinguishing nuisance from negligence, noting that "private nuisance has reference to the *interest invaded*," while negligence refers to "the conduct that subjects the actor to liability for the invasion")

In addition to establishing an invasion of an interest in land, establishing a nuisance generally requires proof of "a continuous or regularly repetitious act or condition" on the subject property. *Barnes v. St. Stephen's Missionary Baptist Church*, 260 Ga. App. 765, 769 (2) (580 SE2d 587) (2003). "The whole idea of *nuisance* is that of either a continuous or regularly repetitious act or condition which causes the hurt, inconvenience or injury." Id. So "[a] single isolated occurrence or act, which if regularly repeated would constitute a nuisance, is not a nuisance until it is regularly repeated." Id. Accord *McBrayer v. Governors Ridge Office Park Ass'n, Inc.* 359 Ga. App. 741, 747 (1) (a) (2) (860 SE2d 58) (2021) ("a single occurrence is insufficient to create a nuisance"). Cf. *Bethany Group, LLC v. Grobman*, 315 Ga. App. 298, 302 (2) (727 SE2d 147) (2012) (affirming denial of summary judgment on nuisance claim where the record showed "repeated instances" of prior crimes on the premises).

Judged against these basic requirements, the Blondells have neither pleaded nor developed an actionable nuisance claim. They allege only that ContraVest "created a . . . private nuisance when it designed, constructed, inspected, and accepted" the poolside swing at Courtney Station "in a manner that posed [a] risk of serious injury" (emphasis supplied).

28

and "maintained this dangerous nuisance and failed to warn of [it]." But neither these allegations nor any evidence identifies any invasion of their interest in the land caused by the swing's installation or its collapse. Just because the Blondells had the right to use and enjoy their apartment and its amenities as tenants of Courtney Station does not mean that any misfortune that happens on the property is an actionable nuisance. See RESTATEMENT (SECOND) OF TORTS § 822, comment c (1979) (noting that negligent conduct may, but does not necessarily, give rise to a private nuisance claim, because a nuisance arises "only when an interest in the use and enjoyment of land is invaded"). To the contrary, no evidence established that the swings at Courtney Station interfered with anyone's use or enjoyment of their possessory interests in Courtney Station before the swing collapsed—in fact, the Blondells had both used the swings before without issue. As for the collapse itself, the Blondells offer evidence that they personally suffered injury, but not that the collapse—an isolated occurrence—amounted to a continuous or repeated invasion of any property interest. See, e.g., *McBrayer*, 359 Ga. App. at 747 (1) (a) (2). Cf. *Camelot Club Condo. Assn., Inc. v. Afari-Opoku*, 340 Ga. App. 618, 623–624 (1) (b) (798 SE2d 241) (2017) (nuisance claim against condominium owner was cognizable based on shooting of resident in condominium parking lot, where there was "ample evidence

29

. . . of prior criminal activities on the premises"). Because the Blondells have not established any basis for liability grounded in a cognizable nuisance theory, we reverse the trial court's denial of summary judgment on their private nuisance claim.

(c) Although ContraVest also challenges the denial of summary judgment as to its claims for punitive damages and attorney fees, the record shows that the trial court explicitly reserved these issues for a later ruling. These issues are therefore not properly before us on appeal.

*Case No. A21A0779*

4. In the third cross-appeal, property owner Courtney Station 300 and management company RAM Partners argue that, as a matter of law, they conducted reasonable inspections and had neither actual nor constructive knowledge of the hazard posed by the eyebolt. We disagree.

A property owner must "exercise the diligence toward making [a] premises safe that a good business person is accustomed to use in such matters. This includes inspecting the premises to discover possible dangerous conditions of which the owner/occupier does not have actual knowledge." *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (1) (493 SE2d 403) (1997) (citations omitted). It follows that an

30

owner/occupier "is generally on constructive notice of what a reasonable inspection conducted in the exercise of ordinary care would reveal." *Johnson St. Props. v. Clure*, 302 Ga. 51, 54 (1) (a) (i) (805 SE2d 60) (2017) (citations omitted).

Here, the evidence viewed in the light most favorable to the Blondells shows a genuine dispute of material fact as to whether reasonable inspection would have revealed the eyebolt problem. The Blondells' expert architect testified that, in his opinion, "[a] reasonable inspection by a knowledgeable and competent property manager would have identified the defective method of installation." This expert opined that the exposed shank of the eyebolt was readily apparent; that reasonable inspections over time would have shown that the hole through which the eyebolt screwed into the beam was getting larger, indicating its capacity for back-and-forth movement; and that a reasonable inspection prior to the accident would have revealed that rust and corrosion had formed on top of the eyebolt and that a groove had formed in the "eye" of the bolt, indicating unusual stress on the bolt and signaling a problem. This testimony is sufficient to create a genuine dispute of fact as to whether Courtney Station 300 and RAM fulfilled their duties to conduct reasonable inspections or were chargeable with constructive knowledge of the hazard posed by the swing. See *Clure*, 302 Ga. at 54 (1) (a) (holding that summary judgment was properly denied based on

31

existence of genuine dispute as to whether a reasonable inspection of a tree limb that later fell on a plaintiff was timely undertaken). The trial court therefore properly denied summary judgment on this issue.

*Judgments affirmed in Case Nos. A21A0731, A21A0740, and A21A0779, and judgment affirmed in part and reversed in part in Case No. A21A0741. Mercier, J., concurs as to Divisions 1, 3, and 4, and concurs in judgment only as to Division 2. Dillard, P. J., concurs as to Divisions 1, 3, and 4, but dissents as to Division 2.*

# In the Court of Appeals of Georgia

A21A0731, A21A0740, A21A0741, A21A0779. BLONDELL et al.
v. COURTNEY STATION 300 LLC et al.; and vice versa

DILLARD, Presiding Judge, concurring in part and dissenting in part.

While I concur in Divisions 1, 3, and 4 of the majority opinion, I respectfully

dissent as to its holding in Division 2. In my view, the trial court erred in concluding

that a genuine issue of material fact remains as to whether Richey Industries's failure

to provide adequate installation instructions or warnings for the swing in question

was a proximate cause of the Blondells' injuries. In essence, the Blondells' argument

is that Richey should be held liable for their injuries because it marketed this

particular swing to both residential and commercial customers and failed to include

adequate installation instructions "for the heavier use the item would receive in a

commercial setting . . . the common area of a busy apartment complex."[1] But even if I were inclined to agree that Richey always has a duty to provide commercial-setting instructions to sophisticated commercial buyers and that this duty was breached by its failure to do so in this case, the Blondells' failure-to-warn claim still fails. I reach this conclusion because the *outdoor* swing worked as intended for over *five years* and the apartment complex, Courtney Station, failed to conduct inspections of the property during that time period—which would have revealed the swing's dilapidated condition. This is, to put it plainly, a classic case of an intervening event cutting off liability for an alleged breach of duty.

It is true, of course, that "[t]he common-law duty imposed on suppliers of chattels includes the duty to warn of *foreseeable* dangers arising from the *reasonable use* for which the product is intended and requires the exercise of reasonable care to inform third parties of the dangerous condition or of the facts which make the product likely to become dangerous."[2] It is likewise true that this "duty to warn" extends to

---

[1] It is ultimately of no consequence whether Richey warned Courtney Station that the swing was not meant for "heavier use" because it is purely speculative that such use had anything to do with the swing falling—especially since it worked for over five years without incident.

[2] *Dozier Crane & Mach., Inc. v. Gibson*, 284 Ga. App. 496, 499 (2) (644 S.E.2d 333) (2007) (punctuation omitted and emphasis supplied); *accord R & R Insulation*

a manufacturer's instructions regarding the installation of its product.[3] Nevertheless, there is no duty imposed on a manufacturer or seller to "warn of a product-connected danger which is obvious or generally known."[4] And as the majority correctly notes, a plaintiff claiming that a manufacturer's inadequate installation instructions resulted in his or her injury must present evidence to support a reasonable inference that the omitted instructions or warnings would have most likely prevented such injury.[5] A "mere possibility" of such causation is "not enough."[6] Indeed, it is a well-settled

_____

*Servs., Inc. v. Royal Indem. Co.*, 307 Ga. App. 419, 427 (3) (705 SE2d 223) (2010); *Camden Oil Co., LLC v. Jackson*, 270 Ga. App. 837, 839-40 (1) (a) (609 SE2d 356) (2004).

[3] *See R & R Insulation Servs., Inc.*, 307 Ga. App. at 427-428; *accord Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891, 894-898 (1) (c) (1)-(3) (605 SE2d 384) (2004).

[4] *R & R Insulation Servs., Inc.*, 307 Ga. App. at 427; *accord Moore v. ECI Mgmt.*, 246 Ga. App. 601, 606 (2) (542 SE2d 115) (2000).

[5] *See R & R Insulation Servs., Inc.*, 307 Ga. App. at 427 (3); *accord Niles v. Bd. of Regents*, 222 Ga. App. 59, 61 (2) (473 SE2d 173) (1996).

[6] *R & R Insulation Servs., Inc.*, 307 Ga. App. at 427 (3); *accord Niles*, 222 Ga. App. at 61 (2); *see Shadburn v. Whitlow*, 243 Ga. App. 555, 556 (533 SE2d 765) (2000) ("On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly

3

principle of negligence law that "the occurrence of an unfortunate event is not

sufficient to authorize an inference of negligence."[7] As a result, when considering the

issue of proximate cause, "[t]he inquiry is not whether the defendants' conduct

constituted a cause in fact of the injury, but rather whether the causal connection

between that conduct and the injury is *too remote* for the law to countenance a

recovery."[8] Foreseeable consequences, then, are those which are "probable, according

to ordinary and usual experience, those which, because they happen *so frequently*,

---

balanced, it becomes the duty of the court to grant summary judgment for the defendant." (punctuation omitted and emphasis supplied)).

[7] *Wolfe v. Carter*, 314 Ga. App. 854, 859 (2) (b) (726 SE2d 122) (2012) (punctuation omitted); *accord Head v. Sears Roebuck & Co.*, 233 Ga. App. 344, 345 (503 SE2d 354) (1998).

[8] *Dowdell v. Wilhelm*, 305 Ga. App. 102, 104 (699 SE2d 30) (2010) (punctuation omitted and emphasis supplied); *accord Med. Ctr. Hosp. Auth. v. Cavender*, 331 Ga. App. 469, 473 (1) (771 SE2d 153) (2015); *see Delta Airlines, Inc. v. Townsend*, 279 Ga. 511, 515 (614 SE2d 745) (2005) (*"*The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, *e.g., intervening act*, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." (punctuation omitted and emphasis supplied)).

may be expected to happen again."[9] Finally, it is well settled that it is the *plaintiff's* burden to establish proximate cause.[10]

In this case, the majority asserts that Richey's failure to provide adequate assembly instructions leaves a question of whether it is more likely than not that the absence of installation instructions was a proximate cause of the Blondells' injuries. It reaches this conclusion despite the *outdoor* swing working as intended for over *five years*. In doing so, the majority cites a single case for the proposition that the five-year lapse of time between the assembly of the swing and the Blondells' injuries is irrelevant to our analysis—*Dozier Crane & Mach., Inc. v. Gibson*;[11] but *Dozier* is distinguishable.[12] In *Dozier*, the plaintiffs alleged that the manufacturer failed to warn

---

[9] *Dowdell*, 305 Ga. App. at 104; *accord Brown v. All-Tech Inv. Grp., Inc.*, 265 Ga. App. 889, 893 (1) (595 SE2d 517) (2003); *Morris v. Baxter*, 225 Ga. App. 186, 187 (483 SE2d 650) (1997).

[10] *See Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 260 Ga. 569, 569 (398 SE2d 16) (1990) ("To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was . . . the "proximate cause" of the injury.").

[11] 284 Ga. App. 496 (644 SE2d 333) (2007).

[12] The majority challenges my view that it too easily dismisses the lengthy time gap between the alleged negligence and the Blondells' injuries; but in doing so, it appears to suggest that proximate cause is almost *always* a policy decision for the jury, and that is simply not the case. Indeed, much of the legal authority cited by the majority in Division 2 is to the general proposition that the issue of proximate cause

5

them of the *latent* dangers associated with operating a crane near power lines.[13] And in stark contrast to this case, *Dozier* did not involve a failure to warn of *obvious* dangers to ensure that the product remained safe over a period of many years (during which time the product was safely used).[14] Instead, the plaintiffs in *Dozier* complained of a manufacturer's failure to warn them of a dangerous way to *use* the crane.[15] In fact, the *Dozier* Court even recognized that "a manufacturer is not normally required to directly warn the ultimate consumer of a known risk if there is a learned intermediary between the manufacturer and the ultimate consumer[,]"[16] which in this case was Courtney Station and its failure to conduct maintenance on the

---

is *ordinarily* decided by a jury. This is, of course, perfectly true, but entirely beside the point. Georgia courts routinely decide the issue of proximate cause as a matter of law in cases such as this—when the alleged negligent conduct is far too attenuated to be the proximate cause of the plaintiffs' injuries. *See supra* notes 24 and 25. Our analysis, then, must be based on whether the *specific* circumstances of the case before us, viewing the evidence in the light most favorable to the nonmovant, creates a jury question on that issue. And here, I conclude that it does not.

[13] *Dozier Crane & Mach., Inc.*, 284 Ga. App. at 499 (2).

[14] *See id.*

[15] *See id.*

[16] *Id.* at 499 (1).

swing for many years.[17] Needless to say, the majority's reliance on *Dozier* is misplaced.

I also disagree with the majority's assertion that none of the alleged negligence of Richey's co-defendants is "the kind of intervening act that would break the causal chain as a matter of law" because, in its view, Courtney Station's failure to conduct maintenance on the property for over five years was reasonably foreseeable and not "sufficient of itself to cause the injury." To be sure, an intervening act will not break the chain of causation between the original wrongful act and the subsequent injury if the character of the intervening act "was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by

---

[17] *See Meadows v. Diverse Power, Inc.,* 296 Ga. App. 671, 672 (1) (675 SE2d 571, 573 (1) (2009) ("The proximate cause requirement constitutes a limit on legal liability; it is a policy decision that for a variety of reasons, *such as an intervening act*, the defendant's conduct and the appellants' injuries are too remote for the law to countenance recovery." (punctuation omitted and emphasis supplied); *Edwards v. Campbell*, 338 Ga. App. 876, 881 (2) (792 SE2d 142) (2016) (same). The majority claims that my conclusion as to proximate cause in this case authorizes "judges to cut off liability solely on the basis that too much time passed," but this is a mischaracterization of my position. Here, the passage of time between the installation of the swing and the Blondells' injuries is *only* an issue because, even if the faulty installation instructions were a cause in fact of the Blondells' injuries, Courtney Station's *failure to perform maintenance* on the swing for five years cuts off Richey's liability due to a lack of proximate cause. I am not suggesting that a lengthy period of time between a negligent act and an injury is, in and of itself, determinative of whether a jury question exists as to proximate cause.

the original wrongdoer."[18] But as the Supreme Court of Georgia has explained, when

a defendant claims that

> its negligence is not the proximate cause of the plaintiff's injuries, but
> that an act of a third party intervened to cause those injuries, the rule is
> that an intervening and independent wrongful act of a third person
> producing the injury, and without which it would not have occurred,
> should be treated as the proximate cause, insulating and excluding the
> negligence of the defendant.[19]

And here, the *outdoor* swing worked as intended for over *five years*, regardless of any

allegedly inadequate installation instructions. Even so, the majority attempts to elide

this crucial fact by reasoning that "the allegedly inadequate inspections, although not

the result of the absence of [assembly] instructions, were not so unforeseeable as to

break the casual chain a matter of law." I am not persuaded. In essence, the majority

would have the manufacturer of an *outdoor* swing be held liable for the Blondells'

injuries when that swing worked properly for over five years after it was purchased

---

[18] *Ontario Sewing Mach. Co. v. Smith*, 275 Ga. 683, 686 (572 SE2d 533) (2002); *accord Goldstein, Garber & Salama, LLC v. J. B.*, 300 Ga. 840, 842 (1) (797 SE2d 87) (2017).

[19] *Goldstein, Garber & Salama, LLC*, 300 Ga. at 841 (1) (punctuation omitted); *accord Avis Rent A Car Sys., LLC v. Johnson,* 352 Ga. App. 858, 861 (2) (b) (836 SE2d 114) (2019).

8

and installed. Indeed, in the majority's view, it was foreseeable that an apartment complex would fail to conduct inspections of its own property over a lengthy period of time. But in so holding, the majority places manufactures like Richey on the hook in perpetuity and stretches our foreseeability jurisprudence to the breaking point. This cannot be and is not Georgia law.

So, even if Richey's failure to provide adequate swing installation instructions were arguably a cause in fact of the Blondells' injuries, it is ultimately of no consequence. The evidentiary record makes clear that Courtney Station failed to conduct inspections of the property for over five years, and had such inspections taken place, the rusted galvanized bolts that resulted in the Blondells' injuries would have been noticed and replaced. In this respect, as aptly noted by Richey, "[t]he simple 'danger' or possibility of exposed metal parts rusting, after many years of use and exposure, is not something that requires any sort of technical expertise, or warning from a manufacturer, but would be well known from common experience as a potential issue." Indeed, the employee who installed the swing testified to that well-known and obvious risk, explaining that—with *proper maintenance*—he would expect the swing installation to last "forever," and that Courtney Station's failure to

replace the rusty eyebolts for so long was "just crazy."[20] And this *undisputed* testimony—from someone experienced in installing swings at various properties—highlights what we all know to be true: Outdoor furniture needs regular maintenance to ensure its safety.

Suffice it to say, when there is an allegation of a failure to warn, there must also be evidence to support a reasonable inference that such a warning would have prevented the injury in question.[21] And importantly, when a "product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession[,] . . . [and] [a] similar rule applies [when] it appears that the person using the product should know of the danger, or should in using the product *discover* the danger."[22] As explained by our Supreme

---

[20] According to this employee, such an installation required the apartment complex to inspect the swing every six months to a year. «**Id**»

[21] *See Ga. Casualty & Surety Co. v. Salter's Indus. Servs., Inc.*, 318 Ga. App. 620, 626 (4) (734 SE2d 418) (2012); *Niles*, 222 Ga. App. at 61 (2).

[22] *Fouch v. Bicknell Supply Co.*, 326 Ga. App. 863, 872 (2) (756 SE2d 682) (2014) (punctuation and citations omitted) (emphasis supplied); *accord Giordano v. Ford Motor Co.*, 165 Ga. App. 644, 645 (2) (299 SE2d 897) (1983); *see Greenway v. Peabody Int'l Corp.*, 163 Ga. App. 698, 702 (2) (294 SE2d 541)(1982) ("It is . . . clear that there is no duty resting upon the manufacturer or seller to warn of a product-connected danger which is obvious, or of which the person who claims to be entitled to warning knows, should know, or should, in using the product, discover.").

10

Court, "there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act (or *omission*) of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendants act, and which was sufficient of itself to cause the injury."[23] To be sure, routine issues of negligence are generally not susceptible of summary adjudication, and summary judgment should not be granted unless "the nonexistence of liability is plain, palpable, and indisputable."[24] But in my view, the Blondells' failure-to-warn claim against Richey easily satisfies this standard. Simply put, I do not agree that Richey's failure to warn Courtney Station of the particular danger at issue—*i.e.*, that an outdoor swing needs to be regularly inspected to ensure its safety—resulted in the Blondells' injuries because it is generally known that neglecting to perform maintenance for a lengthy period of time on *outdoor* furniture is likely to result in it eventually failing.[25] So, while I certainly have the greatest

---

[23] *City of Richmond Hill v. Maia*, 301 Ga. 257, 259 (2) (800 SE2d 573) (2017) (punctuation omitted and emphasis supplied); *accord McQuaig v. McLaughlin*, 211 Ga. App. 723, 726 (440 SE2d 499) (1994).

[24] *Ga. Dep't of Hum. Res. v. Bulbalia*, 303 Ga. App. 659, 663 (2) (694 SE2d 115) (2010) (punctuation omitted).

[25] *See Exxon Corp. v. Jones*, 209 Ga. App. 373, 375 (433 SE2d 350) (1993) ("[S]ince the product was sold to a commercial operator which may reasonably have

sympathy for the Blondells, there is simply no evidence that any negligence on

Richey's part resulted in their injuries.

---

been expected to be familiar with the dangers resulting from such *misuse or neglect*, we do not believe that the manufacturer's failure to warn of such dangers may be considered the proximate cause of the injury. To hold otherwise would be to place upon the manufacturer the impossible task of cataloging every conceivable way in which injury might result from the negligent operation or maintenance of a product." (punctuation omitted and emphasis supplied)); *see eg. Omark Indus., Inc. v. Alewine*, 171 Ga. App. 207, 208 (319 SE2d 24) (1984) (holding that a manufacturer of hydraulic lines was not liable for failing to warn another company of certain dangers they posed because any failure to do so was not the proximate cause of the plaintiff's injuries when they resulted from, *inter alia*, a *lack of maintenance*, misuse, or *neglect* by a third party); *Union Carbide Corp. v. Holton*, 136 Ga. App. 726, 729-30 (1) (222 SE2d 105) (1975) (holding that the plaintiff's injuries from an explosion was not legally caused by the product (the cylinder and its contents) which left the manufacturer's plant, but by the product being misused by some intervening third party (whoever overpressurized the cylinder before the explosion)).