75458. THOMAS et al. v. NEWNAN HOSPITAL et al.

(365 SE2d 859)

McMurray, Presiding Judge.

Appellants Ronald Fred Thomas and Sandra Lynn Thomas brought suit as parents of their deceased infant daughter and as temporary administrators of her estate against appellees Newnan Hospital, Boyce Thomas, M.D. and Kamil S. Cankir, M.D. The complaint alleged that the defendants were negligent, jointly and severally, in failing to render medical care and treatment to Jeanette Thomas with the degree of care, skill and attention required by Georgia law, thereby causing her death. Damages were sought for the full value of her life, for her pain and suffering, for the parents' pain and suffering and for medical and funeral expenses. After an eight-day trial the jury returned a verdict in favor of all the defendants, and this appeal was filed.

The evidence, construed in a light most favorable to support the verdict, was as follows: On Sunday, September 12, 1982, at about 7:20 p.m., three-year-old Jeanette Thomas was taken by her parents to the emergency room of Newnan Hospital. Her vital signs and history were taken by nurse Shirley Henson, who noted that the chief complaint was stomach cramps. The child's temperature was 98.3, her pulse and respiration were regular and her skin was warm, which did not indicate that she was critically ill. She was given a general examination by a pediatrician on call, Dr. Boyce Thomas, including her ears, nose and throat, heart, rectum, palpation of her abdomen and urinary analysis. The examination revealed normal bowel sounds, normal heart rate, no rectal abnormalities and a normal rectal temperature, with no vomiting or observable intervals of pain. At no time did she show symptoms of intestinal prolapse and Dr. Thomas was able to exclude the presence of intussusception (telescoping of the bowel); his impression at the time was that she had a gastrointestinal disorder. The child was given an enema, which seemed to relieve her discomfort, and the parents were told to take her home with instructions to administer paregoric and call Dr. Thomas if her condition changed.

At about 11 p.m. the father called Dr. Thomas to say that the child had begun vomiting, but did not describe the appearance of the vomit as being unusual, nor state that there was a recurrence of severe pain. Dr. Thomas got the impression that she was developing an intestinal virus because her symptoms were not consistent with an abdominal obstruction. He called the emergency room of Newnan Hospital to order a shot of dramamine to be administered, and instructed Jeanette Thomas' father to notify him if the injection did not stop her vomiting. Nurse Ella Ivey gave Jeanette Thomas the dramamine shot, but because this emergency room visit occurred only a few hours after the first one and was only for the purpose of getting a

dramamine shot, there having been no apparent critical change in her condition, the nurse did not perform a full nursing assessment at that time. Mr. Thomas testified that he gave nurse Ivey a bowl into which his child had vomited on her way to the hospital, the vomitus being a very foul-smelling, green-tinged mucous, which the nurse disposed of. Neither nurse had any recollection of the events, which had occurred four years previous to the trial, and their testimony was based upon their medical charts and notes.

When Jeanette Thomas' condition did not improve during the night, she was taken by her parents to Dr. Cankir, their family doctor, the next morning. After taking her history from the mother and examining the child, he asked that she be brought back that afternoon for blood work as she seemed anemic. The child was not in severe pain nor vomiting during this office visit. However, after her father went to fill a prescription from Dr. Cankir, Jeanette Thomas became very weak and the parents took her immediately to Newnan Hospital. Shortly after their arrival there the child went into cardiac arrest. Dr. Thomas, along with other emergency room personnel, resuscitated her and she was transferred to intensive care. Dr. Thomas told the parents he suspected a ruptured appendix and peritonitis and would arrange a consultation with a surgeon, Dr. Matthew Burns. Before the consultation or surgery occurred, Jeanette Thomas stopped breathing at 5:19 p.m. Despite repeated efforts she could not be revived and was pronounced dead at 6:20 p.m. Her death was determined to have been caused by a volvulus resulting from a rare congenital anomaly, or birth defect, a rotation of the small intestine which gradually cut off its blood supply and precipitated gangrene within the child's abdomen. The resultant chemical deterioration ultimately brought about the cardiorespiratory arrest and Jeanette Thomas' death.

At trial, Dr. Sanford Matthews, a practicing physician specializing in pediatrics, presented expert testimony on behalf of Dr. Thomas and Newnan Hospital. Dr. Matthews stated that the initial tentative diagnosis made by Dr. Thomas of gastroenteritis and prescribing paregoric, as well as his later decision to administer an injection of dramamine based upon the telephone conversation with Jeanette Thomas' father, was appropriate and well within the proper standard of care. Dr. Matthews also considered the resuscitative actions taken not only met the standard of care, but were excellent. In his view, the child probably did have gastroenteritis, which precipitated the volvulus through excess activity of the intestines; but when her condition worsened "it was nine hundred and ninety-nine chances out of a thousand that it was appendicitis and one chance out of a thousand it was volvulus, and indeed the greater weight of the evidence would suggest that the child had peritonitis, which in . . . an overwhelming number of instances comes from a ruptured appendix. . . . It was un-

knowable at that time." In his thirty years of practice Dr. Matthews had never treated a child with a volvulus. The vomiting and other symptoms related by the parents and shown by the child upon examination were commonly exhibited symptoms in early childhood, so that the diagnoses and treatment were logical and there was no departure from the standard of care required by OCGA § 51-1-27 as to any of the actions taken. Dr. Cecil Major testified as an expert witness that Dr. Cankir also complied with this standard of care in his treatment of Jeanette Thomas. *Held*:

1. Appellants contend that the trial court erred in ruling that they could not cross-examine Dr. Matthews in regard to his relationship as a consultant to the insurance carrier for Dr. Thomas and Newnan Hospital. They argue that the credibility of the expert witnesses of the parties was critical to the question of liability in this case; that Dr. Matthews was the only witness to testify that Jeanette Thomas was suffering from gastroenteritis when she first sought treatment; and that thus the probative value of showing the extensive relationship between Dr. Matthews and the insurance company for these two defendants outweighed any danger of prejudice to them.

Dr. Matthews testified on direct examination that he had only testified in one medical malpractice action about six or seven years previously, but had given depositions in such cases five or six times. He stated that he had received about seventy-five medical files for review in the last three or four years and revealed what he charged for consultation and depositions. On cross-examination he was questioned as to how much consulting he did for defendants in medical malpractice cases, the rates charged and how much he had been paid as a consultant for defendants in each year since 1982, including the instant suit. The point was clearly made to the jury that Dr. Matthews frequently did consultations for defendant doctors in medical malpractice actions and made considerable sums of money doing so. Dr. Matthews was not allowed to answer whether he had "received more than sixty five percent of consultations requested from sources other than doctors, lawyers and hospitals . . ." Variations on this question were also ruled inadmissible upon objection, as well as the answer that most requests for consultation on cases which might potentially be medical malpractice actions came from insurance companies.

It seems self-evident that insurers when called upon to defend their insureds must have expert advice as to how strong the case is against them, and will employ only the most competent persons for this purpose. It was brought out that Dr. Matthews' professional competency and opinions were highly regarded by other physicians and pediatricians, as evidenced by his service as a guest examiner for the American Board of Pediatrics and as a member of the Peer Review

Committee at Piedmont Hospital overseeing the quality of patient care. He also served as a faculty member or guest teacher at several eminent medical institutions, including Emory and Harvard Universities. There was no indication from the extensive direct and cross-examination of Dr. Matthews before the jury, or from the detailed in camera examination conducted by the trial court in considering what questions to allow on cross-examination, that his opinion was influenced by any "relationship" with defendants' insurer or was anything other than the product of his own experience, interest and involvement in peer review programs, and his study of Jeanette Thomas' medical treatment.

"We adhere to the rule that generally liability or no-fault insurance coverage of a litigant is not admissible in evidence, and that unnecessary disclosure of such fact is ground for mistrial or reversal. [Cits.]" *Goins v. Glisson,* 163 Ga. App. 290, 291 (1), 292 (292 SE2d 917) (1982). "The rule that the plaintiff be allowed the right of a thorough and sifting cross-examination must be balanced against the rule that irrelevant matters of insurance coverage should be excluded from evidence. In the interest of justice, the matter of insurance which is not a germane issue, should be kept out." *Southeast Transport Corp. v. Hogan Livestock Co.,* 133 Ga. App. 825, 830 (3) (212 SE2d 638) (1975). See *A. C. Gas Svc. v. Bickley,* 160 Ga. App. 737, 739 (6) (288 SE2d 84) (1981). We agree with appellees that to accept appellants' arguments would risk injection of the existence of liability insurance into every case in which a defendant doctor or hospital is supported by expert testimony directly or indirectly procured by their insurer. Since appellants were not curtailed in their cross-examination showing that Dr. Matthews was indeed hired as an expert on behalf of the defendants, they have failed to establish any harm or prejudice in not being allowed to pursue the desired cross-examination to show that he was a "regular" expert for their insurer. Thus, we find no abuse of discretion in the trial court's rulings. Accord *Ideal Pool Corp. v. Champion,* 157 Ga. App. 380, 381 (2) (a)) (277 SE2d 753) (1981).

2. Appellants complain that the trial court improperly allowed the two emergency room nurses who saw Jeanette Thomas on the two occasions she was brought there to testify as to their customary procedures in examining patients. Neither of these witnesses could remember the child being treated on either occasion, but testified both on direct and cross-examination from charts and records, none of which included any references to Jeanette Thomas's being in great pain or vomiting. Appellants objected to the nurses' testimony as creating an unwarranted inference that since these conditions did not appear in the charts or notations in the medical records, they were not present, because it was their usual custom and practice to note any unusual symptoms.

However, the rule is well established that a witness may testify to his own fixed habits and customs. *Stephen W. Brown Radiology Assoc. v. Gowers*, 157 Ga. App. 770, 782 (7) (278 SE2d 653) (1981) and cits. "Although a witness may have no distinct or independent recollection of the details of a fact occurring in the course of the routine of his business, he may testify as to his fixed and uniform habit in such cases and state that he knows that he did not vary from that habit. [Cits.] The probative value of such evidence is for the jury to determine. [Cits.]" *Fletcher Emerson Mgt. Co. v. Davis*, 134 Ga. App. 699, 701 (2) (215 SE2d 725) (1975). While appellants could have attempted to show at trial that the nurses negligently failed to recognize alleged symptoms of the patient, the testimony objected to was properly admitted as circumstantial evidence of fixed and uniform habits rather than of conduct in other transactions, which is neither relevant nor admissible. *Fletcher Emerson Mgt. Co. v. Davis*, 134 Ga. App. 699, supra; *Carsten v. Wilkes Supermarket*, 181 Ga. App. 834 (1) (353 SE2d 922) (1987). Compare *Williams v. Naidu*, 168 Ga. App. 539 (309 SE2d 686) (1983); *Thompson v. Moore*, 174 Ga. App. 331 (1) (329 SE2d 914) (1985). Since other witnesses presented contrary testimony, this issue was properly placed before the jury to weigh the evidence and its credibility.

3. Appellants assert that the trial court improperly allowed counsel for Dr. Thomas and counsel for Newnan Hospital to cross-examine each other's witnesses by the use of leading questions. Appellants concede that the allowance of leading questions is a matter within the sound discretion of the trial judge and that reversible error will not be found unless the practice is " 'palpably unfair and prejudicial to the complaining party.' [Cits.]" *Clary Appliance &c. Center v. Butler*, 139 Ga. App. 233, 235 (2) (228 SE2d 211) (1976). They also recognize that Georgia law requires only that such joint opposing parties have " 'distinct interests,' not necessarily opposing interests. [Cit.]" *Lavender v. Wilkins*, 237 Ga. 510, 516 (4) (228 SE2d 888) (1976). They nevertheless insist that there was nothing in the evidence to suggest that there were distinct interests between these two defendants; that they relied upon the same expert witness at trial; that until three weeks prior to trial they were represented by the same counsel; and that "the nature of the charade in which defendants' counsel was engaged" was "palpably unfair and prejudicial."

However, the complaint, jury charges and verdict form reveal that joint and several liability was alleged and litigated, and the trial judge noted in overruling the objection to the leading cross-examination that there was "an adverse situation here [in that] the hospital could be found liable and the doctor could not be; the doctor could be found liable and the hospital could not be." In such a situation of competing interests, "in view of the broad discretion vested in the

trial judge in resolving questions of this nature . . . which discretion necessarily must be exercised before the evidence is complete and the issues are fully developed, . . . and in view of the absence of any showing of harm to appellants, we do not find such abuse of discretion as would require a new trial." *Lavender v. Wilkins*, 237 Ga. 510, supra at 516. Accord *Blue Cross of Ga./Columbus v. Whatley*, 180 Ga. App. 93, 96 (7) (348 SE2d 459) (1986). Cf. *Norman Realty Co. v. Woodard*, 166 Ga. App. 119, 125 (8) (303 SE2d 475) (1983).

4. Appellants called Dr. Matthew Burns and under direct examination he testified that he did not recall having been asked by Dr. Thomas to arrange to see Jeanette Thomas on the afternoon of September 13 for a surgical consultation, and that he never examined her. The thrust of these questions raised an inference that Dr. Thomas had not complied with the statutory standard of due care by failing to arrange for the surgical consultation, or not doing so on a more urgent basis. See *Hawkins v. Greenberg*, 166 Ga. App. 574, 575 (1) (a)) (304 SE2d 922) (1983). Appellees' cross-examination of Dr. Burns was directed at whether Dr. Thomas had met this standard of care, and appellants objected on the ground that this should not be allowed because Dr. Burns had been called as a "factual witness, not an expert witness." Obviously appellees were entitled under OCGA § 24-9-64 to a thorough and sifting cross-examination of this witness, and appellants have cited no authority to support their contention that they were prejudiced by an alleged procedural "ambush." Moreover, on redirect, appellants asked the same types of questions in regard to the standard of care as were deemed inappropriate when asked by appellees on cross.

Both the examination of witnesses and "[r]egulation of the scope of cross-examination is within the sound discretion of the trial court and this discretion will not be controlled unless it is manifestly abused. [Cit.]" *Dept. of Transp. v. 2.734 Acres of Land*, 168 Ga. App. 541, 547 (6) (309 SE2d 816) (1983); *National Land &c. Co. v. Zugar*, 171 Ga. 228 (1) (155 SE 7) (1930). We find no such abuse.

5. In light of the jury's verdict in favor of appellees, which we have upheld here, it is unnecessary to consider the enumeration of error relating to the proper measure of damages to establish the value of the decedent's life.

*Judgment affirmed. Sognier, J., concurs. Beasley, J., concurs in the judgment only.*

DECIDED JANUARY 22, 1988 —
REHEARING DENIED FEBRUARY 9, 1988 —

*James M. Poe, Theodore E. G. Pound*, for appellants.
*David H. Tisinger, C. Jerry Willis, Sidney F. Wheeler, Robert*

*Sullivan*, for appellees.