A93A1725. McQUAIG et al. v. McLAUGHLIN et al.
(440 SE2d 499)

SMITH, Judge.

Sandy McQuaig (hereinafter "McQuaig") and her husband brought this medical malpractice action against Dr. William Mc-Laughlin, his professional corporation, and Satilla Health Services, which operates Memorial Hospital in Waycross. The McQuaigs alleged that professional negligence on the part of the doctor and the hospital's nurses in caring for McQuaig after she gave birth at Memorial Hospital resulted in medical problems which later required exploratory surgery and, eventually, a hysterectomy. Following the presentation of the plaintiffs' case, the defendants moved for a directed verdict, which was granted by the trial court as to all defendants.

The evidence presented at trial showed that McLaughlin was Mc-Quaig's obstetrician during her pregnancy and provided care during her unremarkable prenatal course. She was admitted to Memorial Hospital in labor on Saturday, May 6, 1989, when McLaughlin was not on call. Dr. Malmborg, who was covering for McLaughlin, delivered a girl in the early morning hours of May 7, 1989. The hospital records reveal no complications during the delivery, and show that Malmborg delivered the placenta intact and did an intrauterine manual examination while McQuaig was still under anesthesia to confirm the absence in the uterus of any retained placental tissue. Evidence was also presented showing that during McQuaig's immediate postpartum course, her hematocrit dropped approximately 15 points, she was bleeding heavily, her pulse rate increased, and her blood pressure dropped. Despite standing doctors' orders that they were to notify the doctor of such changes in vital signs and any excessive bleeding, it is undisputed that the nurses did not notify either Malmborg or Mc-Laughlin.

McLaughlin took over McQuaig's care on Monday morning, May 8, 1989, seeing her in her hospital room and reviewing her chart. He discharged her to return home on May 9, 1989, without ordering a repeat hematocrit. McQuaig continued bleeding. Two days later she

returned to Dr. McLaughlin, feeling weak. Her hematocrit on that day, May 11, 1989, had further dropped to 21, substantially below normal. McLaughlin readmitted McQuaig to Memorial Hospital and ordered oxytocic drugs to contract the uterus and a transfusion of two units of packed blood cells. The bleeding improved, and McQuaig was discharged the next day. She did not return to see McLaughlin until her six-week checkup, on June 9, 1989.

In the interim, however, still feeling weak, bleeding, and passing clots, she called McLaughlin, who told her that her symptoms could be normal in some patients, that he believed the problem might be hormonal, and that she should take two birth control pills. On the advice of family members, she then made an appointment with another obstetrician/gynecologist, Dr. Swindle, in Valdosta. She first saw Swindle on May 16, 1989. Her hematocrit at that time was 36, which was within normal limits. Swindle performed a pelvic examination, and he made a provisional diagnosis of postpartum bleeding of questionable etiology and probable endometritis, an infection of the lining of the uterus. On May 24, 1989, he saw her again, with no remarkable findings. He next saw her on June 12, 1989, when she had increased bleeding, a watery discharge, and pain. A culture showed she had an infection of the genital tract, which was treated with antibiotics. On June 14, 1989, Swindle saw her in the emergency room, with continued bleeding and sudden onset of heavy bleeding and passing tissue. He performed a dilatation and curettage, and the pathology report on the removed tissue identified it as necrotic retained placenta, or products of conception. On July 12, 1989, McQuaig was still feeling unwell, with pain and a vaginal discharge. Swindle diagnosed another infection and again treated McQuaig with antibiotics.

Dr. Surrendar Kumar, an obstetrician/gynecologist who treated McQuaig subsequently, provided expert testimony by deposition on behalf of the McQuaigs. He testified that he treated McQuaig for pelvic inflammatory disease, prescribing antibiotics and later performing surgery. He did laser laparoscopy in 1991, and ultimately in 1992, it was necessary to remove McQuaig's uterus and one ovary.

1. Three essential elements must be proved in order to impose liability for medical malpractice: (1) the duty inherent in a professional-patient relationship; (2) breach of that duty by deviating from the appropriate standard of care; and (3) a showing that the failure to exercise the requisite degree of skill is the proximate cause of the injury sustained. *Goggin v. Goldman*, 209 Ga. App. 251, 252 (433 SE2d 85) (1993). The defendants' motion for directed verdict was made and granted on the ground that the McQuaigs had failed to show that any alleged negligence on the part of McLaughlin or the nurses was the proximate cause of her subsequent injury. The McQuaigs contend this ruling was erroneous because Kumar's expert testimony did, indeed,

provide evidence of proximate causation.

(a) It is undisputed that a doctor-patient relationship existed between McLaughlin and McQuaig, and he therefore had a duty to treat McQuaig according to the appropriate standard of care.

All the testifying experts agreed that when faced with postpartum bleeding, a differential diagnosis to rule out its various possible causes would include uterine atony (the loss of muscle tone in the uterus), retained products of conception, vaginal tears, and infection. McLaughlin stated at trial that it was his current belief that McQuaig's bleeding had been within normal limits. He also testified that despite thinking immediately after the delivery that her uterus was firm, he had treated her for uterine atony, which he admitted was inconsistent with a firm uterus. He also acknowledged that he never correctly diagnosed that McQuaig had retained products of conception.

Kumar testified by deposition that he had reviewed the medical records from Memorial Hospital, some prior medical records, and those from Drs. McLaughlin and Swindle. Based on his review of those records and his own examination and treatment of McQuaig, it was his opinion that McLaughlin's treatment of McQuaig had deviated in several respects from the standard of care exercised by physicians in general. Although conceding that retained placenta is a recognized complication following delivery, Kumar enumerated specific diagnostic procedures that in his opinion McLaughlin should have performed. These, he said, would have narrowed the differential diagnosis and would have revealed the true cause of McQuaig's postpartum bleeding significantly earlier, instead of merely slowing the bleeding. These included repeating McQuaig's hematocrit test before discharging McQuaig after her first hospitalization; performing a pelvic examination on May 11, 1989, when McQuaig returned to him following discharge; and doing cultures to determine if infection was present, or using ultrasound to determine if any tissue had been retained in the uterus. According to Kumar, these procedures would have allowed the doctor to rule out other possible diagnoses and to treat McQuaig properly for the actual problem. This testimony served to provide evidence of the second required element, professional negligence.

Kumar testified that in his opinion, McLaughlin should have made the diagnosis of retained products of conception and performed a D&C to remove those products "absolutely no later than May the 11th, '89." In his opinion, the delay in properly diagnosing the cause of McQuaig's bleeding resulted first in bleeding and then in severe infection, because the retained placenta, having inadequate blood supply, degenerated, rendering it an excellent culture medium for harmful bacteria. He testified that although the necrotic tissue was

eventually removed by Swindle and McQuaig was treated with antibiotics, the severe infection by that time had spread deep into McQuaig's body and caused pain and scarring that eventually necessitated a hysterectomy. Swindle did not see McQuaig until damage had already been done. Contrary to appellees' argument, Kumar's opinion that Swindle's treatment was unobjectionable is not inconsistent with his opinion that McLaughlin's treatment deviated from the appropriate standard of care.

In view of this explicit expert testimony regarding the cause of McQuaig's medical problems, we cannot agree with the trial court's conclusion that the plaintiffs failed to show that McLaughlin's alleged professional negligence was the proximate cause of McQuaig's injury. Neither professional negligence nor proximate causation was proved conclusively, since the defense expert disagreed with Kumar as to both negligence and proximate causation. The evidence on both issues was in conflict, leaving the determination of which expert to believe as to both elements in the realm of the jury. See generally *Atlanta Ob. & Gyn. Group v. Coleman*, 260 Ga. 569, 570 (398 SE2d 16) (1990). A motion for directed verdict may be granted only if there is *no conflict* in the evidence as to any material issue and the evidence introduced with all reasonable deductions therefrom, demands a verdict for the movant. OCGA § 9-11-50. Since there was conflicting evidence as to at least two material issues, the trial court's grant of the motion for directed verdict as to defendant McLaughlin was erroneous and must be reversed.

(b) As to the hospital nurses, plaintiff's expert, Nurse Beverly Yeshion, testified to numerous instances in which, in her opinion, the standard of care had not been met because the nurses disregarded standing orders to report to the physician certain fluctuations in vital signs and bleeding. However, unlike Kumar, Yeshion did not offer an opinion whether the deviations from the standard of professional care proximately caused McQuaig's injuries.

Moreover, even assuming, as urged by the McQuaigs, that circumstantial evidence, rather than expert evidence, may be considered as to the element of proximate causation, the alleged negligence was the nurses' failure to report early signs and symptoms to McLaughlin, and it is undisputed that McLaughlin was fully aware of the unreported signs and symptoms by May 8, 1989 and still failed to act in the manner appellants allege was professionally adequate. " 'It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent . . . act, (or omission) of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury. (Cits.) While the question of proximate cause is usually submit-

ted to the jury as a question of fact, it may be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's (alleged omissions) were not the proximate cause of the injury. (Cits.)' [Cit.]" *Powell v. Harsco Corp.*, 209 Ga. App. 348, 350-351 (2) (433 SE2d 608) (1993). Since McLaughlin's alleged intervening negligence, and not the alleged prior negligence of the nurses, was alleged to be the proximate cause of McQuaig's injuries, it follows that the trial court properly granted the motion for directed verdict as to the hospital.

2. Since a new trial must be held, we address those remaining enumerations of error which may recur upon retrial.

The McQuaigs contend the trial court's ruling preventing them from introducing evidence regarding McQuaig's fear of contracting AIDS from the transfusion was erroneous, since anxiety and worry are legitimate components of pain and suffering. See generally *Williams v. Vinson*, 104 Ga. App. 886, 892-893 (6) (123 SE2d 281) (1961). We do not agree.

The trial court ruled that fear of AIDS was "mere speculation. It's a possibility. You can't . . . bring up all these possibilities that may or may not occur." Where a claim is based on negligence, the general rule is that damages for mental distress may not be recovered absent physical injury. *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 150 (311 SE2d 818) (1984). Although plaintiffs claim the transfusion was unnecessary, they assert neither that the transfusion was in itself a cognizable injury nor that such an injury resulted from it. Therefore, damages are not recoverable for any mental distress associated with the transfusion. The trial court correctly granted the defendants' motion to exclude evidence of this fear.

3. The appropriate standard of care in medical malpractice cases is the standard of care exercised in the medical profession generally rather than a local standard. *McDaniel v. Hendrix*, 260 Ga. 857, 858 (401 SE2d 260) (1991). It therefore follows that it would have been irrelevant and improper for the plaintiffs to question Dr. Malmborg as to what action *he* would have taken had he been caring for McQuaig. The trial court correctly ruled this evidence inadmissible.

4. The McQuaigs' contention that the trial court erroneously ruled that they could not cross-examine defense expert witness Dr. Meguiar regarding the fact that he had been retained by the defendants' insurer as well as being their insured is controlled adversely to them by this court's holding in *Thomas v. Newnan Hosp.*, 185 Ga. App. 764, 766-767 (1) (365 SE2d 859) (1988).

*Judgment affirmed in part and reversed in part. Beasley, P. J., and Cooper, J., concur.*

DECIDED JANUARY 26, 1994.

*Sutton & Associates, Berrien L. Sutton, Hallman & Stewart, Ronald W. Hallman,* for appellants.

*Dillard, Bower & East, Terry A. Dillard, Bryant H. Bower, Jr.,* for appellees.