[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12365

Non-Argument Calendar

_____

TIEQIAO (TIM) ZHANG,
Individually, and as administrator of the estate
of Albert Liang (a/k/a Albert Zhang and f.k.a.
Liangsheng Zhang), deceased,
JING (LINDA) LIANG,

Plaintiffs-Appellants,

*versus*

EMORY UNIVERSITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-00868-AT

_____

Before BRASHER, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

This case involves tragic facts. Tieqiao Zhang and Jing Liang ("appellants") appeal the dismissal of their negligence claims against Emory University arising out of the suicide of their son, Albert, an Emory student. On appeal, they argue that the district court procedurally and substantively erred in granting Emory's motion to dismiss. After careful review, we find no reversible error in the district court's well-reasoned orders, so we affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

This appeal is from the district court's dismissal of appellants' amended complaint. We summarize—and take as true—the factual allegations in that complaint. *See Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1363 (11th Cir. 2024).

Albert, after excelling in high school, enrolled at Emory in 2018, having received a scholarship that covered his tuition, fees, and room and board. When he enrolled, he was only 16 years old, so Emory required the appellants to submit their contact information. Albert was the only minor in the Emory Scholar program—which had between 200 and 250 students—during the 2018-19 academic year. Emory represented to Albert's parents that he would participate in the mandatory Emory Scholar advising program, and they believed that he would matriculate under "close supervision, care and protection."

Liang purchased a house near Emory's campus, but the house was vacant, unfurnished, and uninhabitable. Moreover, as a condition of his scholarship, Albert was required to live on campus in Emory-provided housing, so the house remained empty. Albert was assigned an advisor, Dr. Edmund Goode, who was the associate director of the Emory Scholar Program. Dr. Goode encouraged Albert "to reflect candidly on his interests, passions, and pursuits," and the two prepared biannual reports on his educational progress. During his first year at Emory, Albert received high grades and participated in various extracurricular activities. He also became close with Dr. Goode; the two met regularly, spoke on the phone, and exchanged emails about academics and extracurricular activities. Albert also shared personal details about himself with Dr. Goode, including the nature of his difficult and "fraught" relationship with his parents, as well as his "impulsive tendencies."

The amended complaint detailed Emory's suicide prevention programming and training efforts. According to Albert's parents, Emory was aware of various warning signs and "risk factors for suicide"—particularly among college students—including: "feelings of hopelessness and helplessness, impulsive tendencies, trauma or abuse, loss of a relationship, and limited support from family," as well as "indications that the student [i]s in an abusive relationship." Emory also was aware of medical literature that showed that suicide rates for young people were, in 2018-19, the highest they had been in the previous 17 years and that male and Asian-American students were especially at risk. Statistics also

showed that nearly 1 out of every 100 Emory students had at-tempted suicide.

Emory developed programming to reach out to students when suicide risk factors and warning signs were observed, "so that fewer students would consider, attempt and die by suicide." One program, called "EMORY Cares 4 U," was developed to address and help at-risk students. Emory Cares 4 U concluded that male students, Asian American students, and students identifying as LGBTQ were groups especially "at risk" for suicide, and it recom-mended "selective efforts" to help students in those demographics. Another program, called "Question, Persuade and Refer" ("QPR"), trained participants to identify when someone was suicidal, per-suade them to get help, and refer them to the support they needed. The QPR program was developed to help students in distress, in-cluding those facing crises such as homelessness. QPR training was mandatory for Emory staff before 2018-19 but was offered on a vol-untary basis after that point. Emory also had a suicide prevention mobile app. The amended complaint further alleged that Dr. Goode was unaware of many crucial facts about suicide, Emory's suicide prevention efforts, and Emory's policies concern-ing parental consent for counseling services. The complaint also alleged that Dr. Goode had "received absolutely no suicide preven-tion training" and that he did not recognize warning signs of suicide in Albert's behavior while Albert was at Emory.

During the Spring of 2019, Albert told Dr. Goode that he was in a relationship with a female Emory student who was over

18 years old. Dr. Goode's May 2019 report—one of his regular bi-annual reports—reflects that Albert was "juggling" several activities and responsibilities and was "in a serious committed relationship." In Albert's portion of the May 2019 report, Albert indicated that he intended to visit Emory's Counseling & Psychological Services. However, Dr. Goode did not review Albert's portion of the report. According to the amended complaint, Dr. Goode became aware of several facts concerning Albert's romantic relationship with the other student during the 2019 Spring semester, including: (i) that his "parents did not approve of his relationship"; (ii) that his partner "was preventing [him] from freely communicating with his parents"; (iii) that she "was exploiting [his] . . . achievement[s] for her own personal gain"; and (iv) that "there were problems" in the relationship. During the Summer of 2019, after the school year ended, Albert remained at Emory as part of the Scholarship and Service ("SAS") Summer Program. Dr. Goode remained Albert's advisor and directed the SAS program.

Over the summer, Dr. Goode witnessed "friction" between Albert and other students. In June 2019, Albert went to Emory's Counseling & Psychological Services office, but, because he was a minor, Emory would not provide Albert counseling services without his parents' permission. Albert declined to authorize Emory to contact his parents and obtain their consent. Dr. Goode was aware of Albert's attempt to receive counseling and of his "frequent[] stay[s] overnight in an off-campus apartment" with his then-partner. According to the appellants, Dr. Goode also learned that Albert had, "at the insistence of" his partner, "begun cross-dressing,

using colored polish on his fingernails, and identifying as gender-queer."

The SAS program ended in July 2019 and Albert's Fall 2019 residence hall was not available for him to move into until August 24. On August 9, Dr. Goode ran into Albert on campus and Albert "exhibited unusual behavior" and acted startled. On August 15, Albert stopped by Dr. Goode's office and told him that his relationship "had abruptly ended that morning" and that he was asked to immediately leave the apartment where he had been staying. He was now homeless, and he explained that the end of his relationship had been "precipitated by a physical altercation" during which he was assaulted. Albert had a visible red mark on the left side of his neck, as well as a bruise on his chest, which Dr. Goode observed. Albert expressed sadness and concern, noting that his former partner blamed him for the physical altercation. Dr. Goode informed Albert that the incident could have Title IX implications and explained that, as an Emory staff member, he was required to report what Albert had shared. He also advised Albert that if Albert discussed any sexual misconduct or physical abuse during their conversation, Dr. Goode would have to report the alleged misconduct or abuse. Albert then "terminated his description" of the incident.

Dr. Goode did not file a Title IX complaint regarding the discussed incident—either on behalf of Albert or his former partner—but he warned Albert not to apologize or admit guilt, as his statements could be used against him. Albert asked if he could stay

with—or keep his belongings with—Dr. Goode until August 24, but Dr. Goode declined.  The complaint alleged that, because of this meeting, Dr. Goode knew Albert "was distraught" and "appeared . . . to be suicidal, a fact which [Dr.] Goode told officers" after Albert's suicide.  A few days later, Albert sent an email to several Emory employees, including Dr. Benjamin Druss, informing them that he was homeless and had been through a "recent series of unfortunate events."

Dr. Goode saw Albert again on August 24 and learned that Albert's housing for the Fall was in the same residence as Albert's former partner.  Two days later, Albert met with Dr. Goode and explained that his former partner was planning to file a Title IX complaint against him.  Dr. Goode was aware that Albert feared a Title IX investigation would result in his exclusion from the Emory Scholars program and affect his ability to attend medical school.  Dr. Goode, according to the amended complaint, knew that the Title IX complaint would *not* result in these severe consequences to Albert—given the facts that Albert had described—but he did not tell Albert this; instead, he advised Albert to hire an attorney.  Albert also told Dr. Goode that he had begun to "feel trapped," and he left Dr. Goode's office feeling forsaken by Dr. Goode's failure to intervene.

Finally, the amended complaint detailed the facts and circumstances surrounding Albert's death by suicide.  Neither Emory nor Dr. Goode informed Albert's parents about the Title IX complaint Albert's ex-partner filed.  Instead, acting on Dr. Goode's

advice, Albert contacted an attorney, who told him that the Title IX complaint could result in a loss of his scholarship, a suspension, or even criminal charges. The attorney sought a retainer of $50,000. That evening, Albert committed suicide at the vacant home his mother owned. The next morning, Dr. Goode received an automated email from Albert's personal email account, advising him that he could be found at the vacant house. Dr. Goode immediately drove to the house and, after arriving, called the Dekalb County Police Department. Once law enforcement arrived, Dr. Goode told them "that he had a student who appeared to be suicidal." Dr. Goode also shared with the officers that: he had recently spoken to Albert who had been distraught because of the end of his relationship; he observed a red mark on Albert's neck; there was a pending Title IX complaint against Albert; and he had notified Albert that he was a mandatory Title IX reporter. The officers found Albert's body after entering the vacant house and concluded his death was a suicide.

Based on these factual allegations, the amended complaint asserted a "special relationship" between Emory and Albert under Georgia law, and alleged claims against Emory for: (1) negligence; (2) gross negligence; (3) wrongful death; and (4) damages on behalf of Albert's estate. The claims were each premised on Emory breaching its duty of care to Albert, thus causing Albert's suicide. As to the breach of care, the amended complaint alleged numerous failures on Emory's part, including the university's failure to inform Albert's parents about his romantic relationship, his homelessness situation, and the Title IX complaint. The complaint also

23-12365              Opinion of the Court              9

alleged that Emory failed to report the altercation between Albert and his former partner or file a Title IX complaint against her; failed to recognize the various signs of suicide Albert exhibited; failed to provide Albert with housing after he was kicked out of the apartment he had been living in; and failed to abide by its own suicide prevention protocols, including by failing to train Dr. Goode and others in suicide prevention. Albert's parents contended that Albert's death was foreseeable because Emory had "overall knowledge regarding the risk factors, warning signs[,] and behaviors associated with college student suicide" and had available protocols for suicide prevention. The amended complaint identified risk factors that made Albert's suicide foreseeable, including his age, his demographics as an Asian-American and a male, his behaviors, and the fact that he was in distress as a result of his breakup and homelessness. The complaint also stated that "Emory knew that Albert was suicidal prior to the date of Albert's death" and that "[Dr.] Goode specifically informed law enforcement officers that Albert was suicidal before it was discovered that Albert had indeed died by suicide."

Emory moved to dismiss the amended complaint. It primarily argued that "no one, including Dr. Goode . . . expected Albert's suicide." It urged the court to review the documents referenced in the amended complaint because, it contended, the references were "cherry-picked" and the documents, as a whole, supported its position that it did not reasonably foresee Albert's suicide. Emory also argued that, even taking all the allegations as true and setting aside the external documents, there was no plausible allegations that it

knew of Albert's intentions to commit suicide. Emory attached various documents to its motion to dismiss, but only a few are relevant here. The first two relevant pieces of evidence are Albert's August 20 email to Dr. Druss and Dr. Druss's response. Albert's email read:

> Bad News? Unfortunately, I don't think I'll be able to make it to tomorrow's meeting. I'm very sorry for the late notice. A recent unfortunate series of events has caused me to become temporarily homeless myself (ironic, I know). I will be fine and I do have a place to stay, but I just don't think I'll be able to make the meeting tomorrow. Could I get back to you later in the week to find another time?

Dr. Druss responded: "No problem, I hope everything is OK . . . . Keep us posted and let us know if anything would be helpful."

Second, Emory attached a Police Report from the day of Albert's suicide. Mirroring the allegations in the complaint, the Report indicated that Dr. Goode called the police after: (i) receiving an email from Albert—with the address of the vacant home in the subject line—stating: "Hi Ed, Please find me at this address;" (ii) getting no response from Albert after emailing him in response; and (iii) going to the address and not receiving an answer when he knocked on the door. The Report also documented Dr. Goode's comments as to why he called the police, that a medical examiner had ruled Albert's loss as death by suicide—estimating the time of death as being the previous evening—and that the email Albert sent Dr. Goode was automated. The appellants opposed the

motion to dismiss, maintaining that the documents Emory attached to its motion were better suited for the summary judgment phase and that, in any event, Albert's suicide was foreseeable to Emory.

The district court dismissed the amended complaint with prejudice.  First, ruling on the dispute about evidence outside the complaint, the court concluded that it would consider the full email exchange between Albert and Dr. Druss, because that exchange was quoted directly in the amended complaint.  It also considered the Emory Police Report, as it was referenced in the amended complaint, was central to the appellants' claims, and was of undisputed authenticity.  It declined to consider any other evidence outside the amended complaint.

Turning to the merits of the motion to dismiss, the district court explained that it had dismissed the original complaint because the allegations were "not sufficient, without more, to support a factual inference that Emory was in a position to reasonably foresee that Albert might attempt to take his own life."  It noted that courts ruling on similar cases "ha[d] generally required some allegations or evidence that university faculty or staff were more directly alerted to the danger of a potential suicide" than the allegations the appellants initially presented.  The court then explained that the amended complaint suffered from the same deficiencies and, accordingly, failed to state a claim.  It concluded that there were no facts that supported an inference that Dr. Goode or any

other Emory staff member was directed, alerted, or had information to indicate that Albert might attempt suicide.

It also reasoned that the statement that Dr. Goode or "Emory knew that Albert was suicidal prior to the date of Albert's death" was conclusory and unsupported by the factual allegations. The district court focused on the Police Report and allegations in the complaint pertaining to the timing of Dr. Goode's alleged knowledge. The court constructed a timeline based on the allegations in the complaint and Police Report and concluded that it was not until Dr. Goode received Albert's pre-scheduled email following his death that Dr. Goode suspected that Albert might be suicidal.

The district court also rejected the appellants' failure-to-train claim on the ground that a university does not have a duty to provide suicide prevention training to its staff. The court reasoned that, even though Georgia law recognizes a version of the "good Samaritan" doctrine set forth in the Restatements of Torts, *see, e.g.*, *Huggins v. Aetna Cas. & Sur. Co.*, 264 S.E.2d 191, 192 (Ga. 1980), the doctrine was ill-suited to a claim regarding college suicide prevention training.

After expressing deep sympathy to Albert's family, the court concluded that "the governing legal authority in Georgia simply does not provide an avenue for relief given the facts and circumstances alleged" in the amended complaint. Thus, it granted the motion to dismiss, and Albert's parents brought this appeal.

## II. STANDARDS OF REVIEW

We review the dismissal of a complaint for failure to state a claim *de novo*, "accepting the factual allegations in the complaint as true, and construing them in the light most favorable to the plaintiff." *Plowright*, 102 F.4th at 1363 (alterations adopted) (quoting *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (*en banc*)). "Plaintiffs must plead all facts establishing an entitlement to relief with more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1217 (11th Cir. 2023) (quoting *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012)). A "complaint must contain enough facts to make a claim for relief plausible on its face; a party must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Resnick*, 693 F.3d at 1324-25). We need not, however, accept legal conclusions as true, "even when they are 'couched as factual allegations.'" *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024) (alterations adopted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We also review legal issues, such as the proper application of Georgia law, applicable here, *de novo*. *Ramirez*, 69 F.4th at 1217; *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 71-80 (1938).

## III. DISCUSSION

The appellants raise procedural and substantive challenges to the district court's order. Procedurally, they challenge the district court's consideration of documents outside the amended

complaint without converting the motion to dismiss into a motion for summary judgment. Substantively, they argue the allegations in the amended complaint were sufficient to overcome the University's motion to dismiss. We address each argument in turn.

### A. The district court did not err in considering documents outside the complaint at the motion-to-dismiss stage.

The appellants argue that the district court either should have excluded from consideration the documents Emory attached to its motion to dismiss or should have given them notice that it was going to consider such purported evidence and allowed them to engage in additional discovery to further support their claims. "In general, district courts must limit their consideration to the pleadings and any exhibits attached to the pleadings when ruling on a motion to dismiss." *Swinford v. Santos*, 121 F.4th 179, 186–87 (11th Cir. 2024) (citing *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)). "If a party presents, and the court considers, evidence outside of the pleadings, the general rule requires the district court to convert the motion to dismiss into a motion for summary judgment." *Id.* at 187. There are two exceptions, however: (1) the incorporation-by-reference doctrine; and (2) judicial notice. *See id.* (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Under the former exception—relevant here—a court may consider an extrinsic document when it "is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

The district court considered two sources outside the amended complaint: (1) the full email exchange between Albert and Dr. Druss; and (2) the Emory Police Report. We see no error on either front. The court concluded that the email exchange between Albert and Dr. Druss was quoted directly in the amended complaint, so it would consider the whole exchange. *See, e.g.*, *Lewis v. Gov. of Alabama*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) (*en banc*) ("[W]hen a complaint quotes part of a document . . . the full text is incorporated into the amended complaint by reference and is thus properly considered in deciding a Rule 12 motion." (internal quotation and citation omitted)); *Horsley v. Feldt*, 304 F.3d 1125, 1133–35 (11th Cir. 2002) (similar). Our caselaw on this issue is consistent with the common law rule of completeness, "whereby, when a party has introduced part of a writing, an adverse party may require the introduction of any other part which ought in fairness to be considered contemporaneously." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 155 (1988); *see also* Fed. R. Evid. 106. In sum, because the partial quote of the email exchange was in the amended complaint and that the entire email exchange was central to the appellants' claims, the district court permissibly considered the full email exchange. *Johnson*, 107 F.4th at 1300; *Lewis*, 944 F.3d at 1298 n.7; *Horsley*, 304 F.3d at 1133-35.

The district court also did not err in considering the Police Report under the "incorporation by reference" doctrine. *Johnson*, 107 F.4th at 1300. The appellants do not contest the Report's authenticity or that it was central to their claims. *See id.* The appellants relied upon the Police Report to substantiate their position

that it was foreseeable to Emory that Albert would take his own life, and they referenced parts of the Report (Dr. Goode's statements to the officers) as support for that proposition. Therefore, as the Report's authenticity is not in question, it was not improper for the district court to consider it when analyzing whether the appellants sufficiently alleged a violation of rights. *Id.*

### B. The District Court did not err in granting Emory's motion to dismiss

Substantively, the appellants make several arguments. First, they argue that, if the court had drawn reasonable inferences from the amended complaint in their favor, their claims would have moved forward. They rely on *Wyke v. Polk County School Board*, 129 F.3d 560 (11th Cir. 1997), which they assert is "analogous" to the facts here. They argue that Dr. Goode possessed the necessary knowledge to create a duty to disclose "information concerning [Albert's] health and safety" to them, as his parents, given the fact that he was a minor. They also contend that the issue of foreseeability was a jury question and that a reasonable jury could find that Albert, Emory, and the appellants had a special relationship, that Emory breached a duty of care, and that Albert's death was foreseeable. They argue that "no direct knowledge that [Albert] would commit suicide was or is required" for their claims to succeed and they discuss cases from other circuits which, they assert, show error in this respect. Even if direct knowledge were required, they also contend that a reasonable jury could find that Emory—through Dr. Goode—should have foreseen that the failure to report or investigate Albert's allegations of physical and sexual abuse

could result in him hurting himself.  They also, for the first time, contend that the amended complaint plausibly alleged negligence *per se* based on Emory's failure to adhere to Title IX.  They assert that their negligence *per se* theory should have been submitted to a jury as well.  The appellants argue the court placed too much weight on the chronology of events—and improperly weighed evidence—regarding Emory's position that Dr. Goode only suspected Albert was suicidal after he received the email from Albert.  Instead, they contend, the complaint plausibly alleged that Dr. Goode "was aware that Albert was suicidal" before he received the email from Albert.  Finally, they reiterate that foreseeability is a jury question and argue that the instant case is similar to cases where a duty of care is owed to prevent inmate/prisoner suicide, and they contend Emory policies and suicide prevention efforts made the claims plausible.

Emory maintains that, based on the allegations and evidence properly before the district court, there is no plausible allegation that Dr. Goode considered Albert to be suicidal until after he received the email from Albert.  It also argues that the appellants' two new theories on appeal—"health emergency of a minor child" and negligence *per se*—are unavailing.

Under Georgia law, a plaintiff alleging negligence must show "the existence of a duty on the part of the defendant, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of the duty."  *Rasnick v. Krishna Hosp., Inc.*, 713 S.E.2d 835, 837 (Ga. 2011); *see also City of Richmond Hill v. Maia*,

800 S.E.2d 573, 576 (Ga. 2017).  As to the causation element, a plaintiff must show that "the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of the injury."  *Maia*, 800 S.E.2d at 576 (quoting *Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 398 S.E.2d 16, 17 (1990)).  "Inextricably entwined with concepts of negligence and proximate cause is a notion of foreseeability."  *Id.* (quoting *Brandvain v. Ridgeview Inst., Inc.*, 372 S.E.2d 265, 272 (Ga. 1988)).  Accordingly,

> there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not *foreseeable* by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

*Id.* (emphasis in original) (quoting *McQuaig v. McLaughlin*, 440 S.E.2d 499, 502–03 (Ga. 1994)).

Under Georgia law, in these circumstances, "the usual foreseeability principle *does not* apply" because "generally speaking, suicide is deemed an unforeseeable intervening cause of death which absolves the tortfeasor of liability."  *Id.* (emphasis in original) (collecting cases).  However, Georgia courts have recognized two exceptions, or "deviations" from this rule: "the so called rage-or-frenzy exception and the special-relationship exception."  *Id.* at

577.[1] Foreseeability is relevant to these two "narrow exceptions" but "does not, alone, overcome the principle that suicide is deemed an unforeseeable intervening act that severs liability of a negligent tortfeasor." *Id.* at 593 n.3. In other words, foreseeability *plus* one of the two exceptions is necessary to establish causation under Georgia law in these circumstances. *See id.* In many cases, the questions of proximate cause and foreseeability are jury questions. *See id.* at 578. However, "it will be determined by the court as a matter of law in plain and undisputed cases." *McAuley v. Wills*, 303 S.E.2d 258, 260-61 (Ga. 1983); *Maia*, 800 S.E.2d at 578 (concluding the facts presented such a circumstance).

Our application of Georgia's heightened liability standard in negligence cases involving suicide requires us to conclude that the amended complaint fails to plausibly allege that Emory's staff, specifically Dr. Goode, should have foreseen that Albert would attempt suicide. Although Georgia law first requires that there was a "special relationship" between Emory and Albert, *see Maia*, 800 S.E.2d at 577-78, 593 & n.3; *see also id.* at 262-63 (Melton, J., concurring) (discussing the special relationship exception), we do not

---

[1] The rage or frenzy exception applies where a party's "wrongful act produces such a rage or frenzy that the injured person destroys himself during such rage or frenzy, or in response to an uncontrollable impulse . . . ." *Appling v. Jones*, 154 S.E.2d 406, 409 (Ga. Ct. App. 1967). The exception "requires a showing that the suicide was a product of insanity, delirium, an uncontrollable impulse, or was accomplished without conscious volition to produce death." *Maia*, 800 S.E.2d at 577-78. The amended complaint does not present facts suggesting the rage-or-frenzy exception applies and the appellants do not argue that it applies on appeal.

address this element of the appellants' claim.  Even assuming, without deciding, that such a "special relationship" existed, the amended complaint still fails to state a claim.

The amended complaint states that (1) "Emory knew that Albert was suicidal prior to the date of Albert's death" and that (2) "[Dr.] Goode specifically informed law enforcement officers that Albert was suicidal before it was discovered that Albert had indeed died by suicide."  The first of these statements about Emory and Dr. Goode's knowledge is a legal conclusion styled as a fact, which does not factor into our analysis.  *Wainberg*, 93 F.4th at 1224 ("[W]e need not accept legal conclusions, even when they are 'couched as . . . factual allegation[s].'" (quoting *Iqbal*, 556 U.S. at 678)).  To the extent the amended complaint simply asserts that foreseeability was present, it was not enough standing alone to state a plausible claim.  *Ramirez*, 69 F.4th at 1217; *Resnick*, 693 F.3d at 1324-25.

The other documents before the court, such as the email between Albert and Dr. Druss, do not plausibly allege foreseeability either.  In his email to Dr. Druss, Albert, after being kicked out of his ex-partner's apartment, told Emory that that he was "temporarily homeless" and would not be able to attend a meeting.  However, he also expressed that he would "be fine" and that he did "have a place to stay."  He did not make any statement that can be read to suggest he was considering self-harm, and the tone of the email does not plausibly convey immediate danger.  In short, Albert's email to Dr. Druss did not put Emory on notice that Albert

was suicidal. Dr. Druss's email response—"No problem, I hope everything is OK . . . [L]et us know if anything would be helpful"—shows that Emory employees recognized Albert was facing a difficult situation—and offered assistance to him. However, the exchange does not suggest that anyone at Emory knew Albert was suicidal because of that situation.

The Emory Police Report supports the same conclusion and describes how Albert timed his automated email to Dr. Goode so that it would not be sent until the next day, which also, unfortunately, was after he had already committed suicide. Dr. Goode's actions after Albert had already committed suicide also show that he did not immediately—or previously—know that Albert was suicidal. When Dr. Goode received the email from Albert, he responded to the email, tried to find Albert, and went to the address Albert had provided, arriving 28 minutes after he received Albert's email. When no one answered the house door, Dr. Goode called the police and expressed his concern at that time that Albert might be suicidal. Thus, the allegations show that Dr. Goode was generally concerned about Albert after receiving the email, went to check on him, became more concerned when Albert did not appear, and then called the police as he began to fear the worst. Thus, the Police Report does not support any allegation that Dr. Goode foresaw or should have foreseen Albert's suicide.

Furthermore, Emory's creation and maintenance of a suicide prevention program is not evidence that suggests it knew or should have known that Albert would commit suicide. Again, the

amended complaint had to plausibly allege that Emory and Dr. Goode could or should have foreseen that Albert as an individual—not simply because he was Asian American and male—was highly likely to commit suicide. In addition, as discussed above, Albert's email to Dr. Druss—which explained that he would "be fine" and did "have a place to stay"—provided a strong reason that Emory would not be as concerned with more generalized or demographic-based risk factors like Albert's age, race, or sex. Given the lack of factual allegations that suggest that Albert's suicide was foreseeable to the University, the complaint was insufficient to state a claim for negligence under Georgia law.

The appellants' reliance on *Wyke v. Polk County School Board*, is also misplaced. In *Wyke*, a case involving Florida law,[2] a student had recently attempted suicide twice while at school, "ma[king] it quite possible to conclude that [the student]'s [later, successful] suicide was foreseeable" to school officials. 129 F.3d at 563-65. Unlike in *Wyke*, Emory had no notice regarding any prior suicide or other self-harm attempts by Albert, his email did not indicate he planned to harm himself, and the timing between when his email was received and when he committed suicide did not provide Emory or the policy any time to intervene. *Wyke* thus presented much stronger facts laying out the basis for a plausible

---

[2] The appellants here do not argue that Florida or federal law should apply, and the amended complaint's claims were brought under Georgia law—which creates stark limits on negligence claims premised on suicides, as we have summarized above. *Maia*, 800 S.E.2d at 576-77.

foreseeability argument. *See id.* Therefore, *Wyke* does alter our conclusion that the amended complaint did not state a plausible claim for relief.[3]

Finally, the appellants contend, arguably for the first time on appeal, that the defendants are liable under a "negligence *per se*" theory. *See Finnegan v. Comm'r*, 926 F.3d 1261, 1271 (11th Cir. 2019) (explaining that, generally, issues not raised in the district court cannot be raised on appeal). In any event, the argument is without merit. Under Georgia law, "even when negligence *per se* has been shown, proximate cause must still be proved." *Cent. Anesthesia Assocs., P.C. v. Worthy*, 333 S.E.2d 829, 833 (Ga. 1985) (citing RESTATEMENT (SECOND) OF TORTS § 288B, cmts. a & b (Am. L. Inst. 1965)); *see also Goldstein, Garber & Salama, LLC v. J.B.*, 797 S.E.2d 87, 91 (Ga. 2017); *Principle Sols. Grp. v. Ironshore Indem., Inc.*, 944 F.3d 886, 892 (11th Cir. 2019). Thus, whether styled as a traditional negligence or negligence *per se* claim, appellants' failure to plausibly allege foreseeability defeats both theories of liability. *Worthy*, 333 S.E.2d at 833; *Goldstein, Garber & Salama*, 797 S.E.2d at 91.

---

[3] The out-of-circuit caselaw cited by the appellants is also unavailing. First, of course, we are not bound by the decisions of our sister circuits. Second, and more importantly, none of the cited cases apply Georgia law. *See Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873 (6th Cir. 2020); *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441 (7th Cir. 2000). Our task is to determine whether, under Georgia's heightened liability standard in suicide cases, the amended complaint stated a claim, and these cases provide very little insight on that question.

## IV. CONCLUSION

As we recognized at the outset, this case is tragic.  Even so, for the reasons we have explained, Georgia law affords the appellants no relief under these circumstances, and the district court committed no reversible error.  Therefore, we affirm.

**AFFIRMED.**